UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| REBECCA BEHLEN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:21-cv-00317-JAW |
| | ) | |
| ASCENTRIA CARE ALLIANCE, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON SUMMARY JUDGMENT**

An employer-defendant brings a motion for summary judgment against a former employee's claim pursuant to Federal Rule of Civil Procedure 56. The former employee alleges that the employer retaliated against her in violation of the Maine Human Rights Act for engaging in protected activity under the Maine Whistleblower Protection Act. The employer claims instead that it fired her for violating its Equal Employment Opportunity Policy by making inappropriate comments on the race and national origin of her co-workers. The Court denies the employer's motion for summary judgment because genuine issues of material fact preclude summary judgment as to the former employee's claim.

## I.   PROCEDURAL HISTORY

On May 31, 2021, Rebecca Behlen filed a complaint against her former employer Ascentria Care Alliance (Ascentria) in Cumberland County Superior Court, alleging retaliation in violation of the Maine Human Rights Act for engaging in protected activity under the Maine Whistleblower Protection Act. *State Ct. R.*, Attach. 5, *State Ct. Compl.* (ECF No. 3) (*Compl.*). On November 11, 2021, Ascentria

removed the case to this Court, *Notice of Removal* (ECF No. 1), and filed an answer generally denying the Complaint's essential allegations and raising affirmative defenses. *Def. Ascentria Care Alliance's Answer and Affirmative Defenses to Pl.'s Compl.* (ECF No. 7).

On September 14, 2022, the discovery period lapsed, *Order* (ECF No. 16), and on December 16, 2022, Ascentria filed its motion for summary judgment and statement of material facts. *Def. Ascentria Care Alliance's Mot. for Summ. J. and Incorporated Mem. of Law* (ECF No. 24) (*Def.'s Mot.*); *Def. Ascentria Care Alliance's Statement of Material Facts* (ECF No. 25) (DSMF). On January 25, 2023, Ms. Behlen filed her opposition, *Pl.'s Mem. of Law in Supp. of Pl.'s Opp'n to Def.'s Mot. for Summ. J* (ECF No. 33) (*Pl.'s Opp'n*), her opposition to Ascentria's statement of material facts, *Pl.'s Opp'n to Def.'s Statement of Material Facts* (ECF No. 34) (PRDSMF), and her opposing statement of additional material facts. *Pl.'s Statement of Material Facts* (ECF No. 35) (PSAMF).

On February 8, 2023, Ascentria replied, *Def.'s Reply in Supp. of Mot. for Summ. J. and Incorporated Mem. of Law* (ECF No. 36) (*Def.'s Reply*), and filed a response and objections to Ms. Behlen's statement of additional material facts. *Def. Ascentria Care Alliance's Reply to Pl.'s Statement of Additional Material Facts* (ECF No. 37) (DRPSAMF).

## II.   THE FACTS

### A.   Rebecca Behlen's Background and the Falmouth House Facility

Rebecca Behlen is 70 years old and has spent much of her employment career working with mentally disabled individuals; it is her passion. PSAMF ¶ 1;

DRPSAMF ¶ 1. Ms. Behlen has been certified as a residential medication aide, a direct support professional, and a professional support specialist. PSAMF ¶ 2; DRPSAMF ¶ 2. In 2004, Ms. Behlen moved to Maine and continued to work with mentally disabled individuals, initially employed by Support Solutions where she subsequently became a Director. PSAMF ¶ 7; DRPSAMF ¶ 7.

Ms. Behlen has done missionary work in India and Africa. PSAMF ¶ 4; DRPSAMF ¶ 4. She was engaged to an African American and the two had planned a trip to Angola to do housing for the poor, but the trip was cancelled due to the sudden death of her partner. PSAMF ¶ 5; DRPSAMF ¶ 5. Ms. Behlen has worked with individuals of African descent for her entire career. PSAMF ¶ 6; DRPSAMF ¶ 6. She has friends of African descent, and she once had a roommate for ten years who was African American. *Id.*

In 2006, Ms. Behlen began employment with Ascentria as a Direct Support Professional (DSP). PSAMF ¶ 8; DRPSAMF ¶ 8; DSMF ¶ 1; PRDSMF ¶ 1. During her employment, Ascentria frequently offered Ms. Behlen management positions because of her experience, but she declined the positions because she wanted to focus on providing direct care to the residents. PSAMF ¶ 9; DRPSAMF ¶ 9. Ascentria nevertheless used Ms. Behlen to train new employees at the group home. PSAMF ¶ 9; DRPSAMF ¶ 9.

As a DSP, Ms. Behlen provided care to individuals with disabilities at Ascentria's residential facilities including, primarily, a facility called the Falmouth House. DSMF ¶ 2; PRDSMF ¶ 2. Ms. Behlen spent 90% of her employment at

Ascentria working at the Falmouth House.  PSAMF ¶ 10; DRPSAMF ¶ 10.  During Ms. Behlen's employment, the Falmouth House had two adult residents, both mentally disabled men in their fifties and sixties with diagnoses including paranoid schizophrenia.  PSAMF ¶ 11; DRPSAMF ¶ 11. Ms. Behlen was fiercely dedicated to ensuring the residents received proper care and was not afraid to speak her mind and voice her concerns to immediate supervisors and higher management if adequate care was not provided.  PSAMF ¶ 3; DRPSAMF ¶ 3.  According to Ms. Behlen, the residents' disabilities can be triggered by diversion from their set routines and individuals speaking in languages other than English, causing the residents to think the individuals are talking about them.  PSAMF ¶ 12; DRPSAMF ¶ 12.[1] Ms. Behlen worked alone with one of the residents, and she worked weekends for 48 hours. PSAMF ¶ 13; DRPSAMF ¶ 13.  Ms. Behlen frequently vocalized her displeasure with conditions at the Falmouth House and the staff not fulfilling their duties to the detriment of the residents.  PSAMF ¶ 14; DRPSAMF ¶ 14.  The Falmouth House was staffed with approximately six DSPs, who directly reported to a Team Leader.  DSMF ¶ 3; PRDSMF ¶ 3.

Adam James (AJ) Grant, who began working for Ascentria in 2009, was the Team Leader at Falmouth House beginning in mid-2018.  DSMF ¶ 4; PRDSMF ¶ 4; PSAMF ¶ 15; DRPSAMF ¶ 15.  Michael Moore was also a Team Leader at Falmouth House in 2018.  DSMF ¶ 5; PRDSMF ¶ 5. As Team Leader, Mr. Grant was responsible for making staff schedules at Falmouth House, updating medication information and

---

[1]      Ascentria admits PSAMF ¶ 11 "to the extent Plaintiff believes this to be true."  DRPSAMF ¶ 11.  The Court slightly alters PSAMF ¶ 11 to indicate that this fact reflects Ms. Behlen's opinion.

appointments for Falmouth House residents, and performing other administrative-type duties. DSMF ¶ 6; PRDSMF ¶ 6. Mr. Grant testified that when he took over as team leader, the condition of the Falmouth House was "not that great" and some staff would not employ common sense in addressing problems, instead "people were just trying to pass the buck, oh, I can't do this, let's get [Mr. Grant] to do it or let's get someone else to do it." PSAMF ¶¶ 16-17; DRPSAMF ¶¶ 16-17.[2] He further testified that male employees from the African countries "just wouldn't do any of the cooking," and when he instructed a male about serving dinner to one of the residents, the man replied, "Oh, I don't do cooking, that's women's work." PSAMF ¶¶ 18-19; DRPSAMF ¶¶ 18-19.

As a Team Leader, Mr. Grant reported to the Program Manager. DSMF ¶ 7; PRDSMF ¶ 7. Between 2018 and 2019, the Program Managers for Falmouth House were Linet Katembe and Naomi Kordak. DSMF ¶ 8; PRDSMF ¶ 8. Ms. Katembe and Ms. Kordak are both of African descent. DSMF ¶¶ 9-10; PRDSMF ¶¶ 9-10. Ms. Katembe and Ms. Kordak reported to Zoe Sweet, the Director of Developmental Services. DSMF ¶ 11; PRDSMF ¶ 11. DSPs also reported to their respective Program Managers. DSMF ¶ 12; PRDSMF ¶ 12.

Ms. Behlen's duties at Falmouth House included providing physical care to residents, bathing residents, feeding residents, monitoring resident medications, and

---

[2]      PSAMF ¶ 16 states: "Grant testified when took over [sic], the condition of the Falmouth House was 'not great.'" Ascentria interposed a qualified response, stating that Mr. Grant testified that when he took over as team leader, the condition of Falmouth House was "not that great." DRPSAMF ¶ 17. Having reviewed the transcript of Mr. Grant's testimony, the Court agrees that Mr. Grant was describing the condition of Falmouth House when he took over as team leader. *See Aff. of Guy D. Loranger*, Attach. 17, *Dep. of Adam James K. Grant* 11:1-3 (ECF No. 31). The Court amended PSAMF ¶ 16 to conform to the record.

5

monitoring resident safety.  DSMF ¶ 16; PRDSMF ¶ 16.  Ms. Behlen's job description provided that she was required to "provide support and advocate[] for clients as appropriate" and "ensure [the] health and safety of [residents]."  DSMF ¶ 17; PRDSMF ¶ 17.  Ms. Behlen understood that her job required her to advocate for a client who is ailing or being mistreated.  DSMF ¶ 18; PRDSMF ¶ 18.  She was also a mandated reporter, including on matters of patient abuse.  DSMF ¶ 19; PRDSMF ¶ 19.

In Ms. Behlen's final year of employment, she trained several new employees recently arrived from Africa to work at Falmouth House.  PSAMF ¶ 20; DRPSAMF ¶ 20.  Ms. Behlen noticed that the new employees frequently declined to follow appropriate protocol and created potential risks to the health and welfare of the residents of the home.  PSAMF ¶ 21; DRPSAMF ¶ 21.  According to Ms. Behlen, some of the new employees from Africa had problems speaking and writing in English, which sometimes made it problematic for the two residents due to their mental disabilities.  PSAMF ¶ 22; DRPSAMF ¶ 22.[3]

Ms. Behlen gave notice to management of the new employees not performing their jobs, but according to Ms. Behlen the problems persisted.  PSAMF ¶ 25; DRPSAMF ¶ 25.[4]  Ms. Behlen repeatedly shared concerns as to the program with the prior Program Manager David Sturtevant and Team Leader Michael Moore and felt that she "was and am diligent in reporting issues."  DSMF ¶ 28; PRDSMF ¶ 28.

---

[3]     Ascentria admits PSAMF ¶ 22 "to the extent Plaintiff believes this to be true."  DRPSAMF ¶ 22.  The Court slightly alters PSAMF ¶ 22 to indicate that this fact reflects Ms. Behlen's opinion.
[4]     Ascentria admits PSAMF ¶ 25 "to the extent Plaintiff believes this to be true."  DRPSAMF ¶ 25.  The Court slightly alters PSAMF ¶ 25 to indicate that this fact reflects Ms. Behlen's opinion.

According to Ms. Behlen, she tried to teach the employees some key phrases in English, but some of the males said they did not like to be taught by a woman, and when Ms. Behlen told them not to be on the phone, some men said they did not like a woman to tell them what to do, even referring to Ms. Behlen as a bully.  PSAMF ¶ 23-24; DRPSAMF ¶ 23-24.[5]

### B.      Ascentria Care Alliance's Equal Employment Policies

Ascentria maintains an EEO Policy, which provides, in relevant part:

> It is the policy of Ascentria Care Alliance to prohibit discrimination and provide equal opportunities for all individuals regardless of race, color, religion, sex, national origin, age, physical or mental disability, genetic information, pregnancy, status as a veteran, sexual orientation, gender expression or identity, or any other legally protected category.
>
> This policy applies to all phases of the personnel process, including recruitment, interviewing, hiring, placement, promotion, transfer, demotion, training, layoff, recall from layoff, benefits, and compensation, as well as all other employment terms, conditions, benefits, discipline, separation, and agency-sponsored social activities.

DSMF ¶ 13; PRDSMF ¶ 13.  Ascentria's Ethics Statement provides, in relevant part:

> As a condition of employment, all employees at Ascentria Care Alliance and its subsidiaries shall conduct themselves in accordance with professional ethics and all rules of practice and other regulations adopted by the agency.
>
> . . . .
>
> Each agency employee[] shall adhere to the following standards and practices:
>
> . . . .
>
> B. Will not discriminate or refuse services to anyone on the basis of race, color, sexual orientation, age, sex, religion, disability, or nationality.
>
> . . . .

---

[5]      Ascentria admits PSAMF ¶ 23-24 "to the extent Plaintiff believes this to be true."  DRPSAMF ¶ 23-24.  The Court slightly alters PSAMF ¶ 23-24 to indicate that this fact reflects Ms. Behlen's opinion.

> E. Will respect the rights and views of colleagues and treat them with fairness, courtesy and good faith.
>
> F. Will not engage in or condone any form of harassment toward . . . any member of the workforce.

DSMF ¶ 14; PRDSMF ¶ 14.  Ms. Behlen understood and signed the Ethics Statement, which also provides that the employee "[u]nderstands that violation of this code of ethics may be grounds for disciplinary action to include termination of employment." DSMF ¶ 15; PRDSMF ¶ 15.

### C. Rebecca Behlen's Interactions with Supervisors at Falmouth House Prior to her 2018 Corrective Action

In a March 20, 2010, email, Ms. Behlen made a complaint concerning backpay. DSMF ¶ 21; PRDSMF ¶ 21.  In a March 25, 2010, email from Ms. Behlen to her supervisors, she reported concerns as to resident medication management and storage.  DSMF ¶ 20; PRDSMF ¶ 20.  On April 5, 2010, Ms. Behlen reported concerns to her supervisor as to improper medication storage.   DSMF ¶ 22; PRDSMF ¶ 22. Ms. Behlen presented further concerns as to medication errors on April 6, 2010, noting that she was "surprised that DHHS hasn't shut the place down."  DSMF ¶ 23; PRDSMF ¶ 23.

On May 30, 2011, Ms. Behlen described a client's residence as "depressing," noting something "just doesn't seem ethically moral" with the situation and reported dietary concerns and "caddy" staff members.[6]  DSMF ¶ 24; PRDSMF ¶ 24.

---

[6]       Ascentria correctly cites Ms. Behlen's spelling of the word, but in the context of the referenced exhibit, Ms. Behlen is clearly referring to the staff being catty.  *Alvarez Decl.* Attach. 9, email from Plaintiff to dstrurtevant (May 30, 2011).

On April 23, 2012, Ms. Behlen reported sexual harassment allegations at Falmouth, further noting that she has "zero tolerance for sexual inappropriateness and racial ignorance on the job; this is 2012." DSMF ¶ 26; PRDSMF ¶ 26.

Ms. Behlen sent additional emails to a supervisor with concerns as to client care on December 13, 2010, March 11, 2011, July 9, 2017, August 27, 2017, September 3, 2017, January 28, 2018, February 25, 2018, March 17, 2018, April 8, 2018, May 13, 2018, July 1, 2018, August 1, 2018, and August 19, 2018. DSMF ¶ 25; PRDSMF ¶ 25.

On August 26, 2018, Ms. Behlen sent an email to Ms. Sweet and Ms. Kordak, reporting another "botched" Sunday due to the arrest of a staff member, Adelard Ndjoli, who is from the Congo, explaining how this arrest had adversely affected a client. PSAMF ¶ 26; DRPSAMF ¶ 26; DSMF ¶ 27; PRDSMF ¶ 27. The arrest took place while Mr. Ndjoli drove a resident around for his daily car ride. PSAMF ¶ 27; DRPSAMF ¶ 27. In the email, Ms. Behlen requested that Bo Great replace Mr. Ndjoli on Sundays "because he is reliable and without all the drama." PSAMF ¶ 28; DRPSAMF ¶ 28. Ms. Behlen also wrote that she believed Mr. Great would be willing to relieve her with some of the housework as "I try to clean here on the weekend and do laundry, but it has become that I am looked at as the resident housekeeper, cook, launderess, etc." PSAMF ¶ 29; DRPSAMF ¶ 29.[7] Ms. Behlen concluded by writing,

---

[7]     Ascentria qualifies PSAMF ¶ 29, saying Ms. Behlen's email "proposed tasks for [Mr. Great], stating that '[Mr. Great] could be doing maintenance work in the morning . . . and then could do a thorough cleaning of [a resident]'s room,' and that '[Mr. Grant] could also do the lawn work and when winter snow arrives, I know he will assist with the driveway (the Africans come in flip flops and say shoveling isn't in their job description)'" and thus "there is no support for the contention that [Mr. Great] was 'willing to relieve [Ms. Behlen].'" DRPSAMF ¶ 29 (quoting *Jt. R. Materials*, Attach. 17, *Email Another Sunday Debacle Dated August 26, 2018*). To the extent Ascentria's qualified reply

"I am tired of dealing with drama every Sunday and the irresponsible, unreliable staff will drive me to an early retirement faster than any client will!"  PSAMF ¶ 30; DRPSAMF ¶ 30.

### D.    Rebecca Behlen's 2018 Disciplinary Action

Ms. Behlen was not subject to any corrective or disciplinary action until 2018. DSMF ¶ 29; PRDSMF ¶ 29.  In September 2018, Liam Sullivan, a DSP who worked with Ms. Behlen at Falmouth House, emailed Ms. Sweet regarding concerns about Ms. Behlen.  DSMF ¶ 46; PRDSMF ¶ 46.  Mr. Sullivan's email stated:

> Hi Zoe,
> I'm sorry to bother you with this, but I feel something needs to be done. I have worked with [Ms.] Behlen for the last 10 years, and in that time, I've seen her verbally bully other staff and be a bit overbearing with clients, but never until now have I felt that she crossed any lines. Recently, but as far back as probably a couple months ago, she has been voicing her distaste of "all Africans."  It began with subtle comments being made about their work ethic but has continued to their religious choices as well as constantly saying she wishes they would all go back to Africa.  This past weekend he went as far as to claim that she asked our team leader, [Mr. Grant] if he "could just hire some white people, or at least a black person from America."  She has said, more than once that she "wasn't like this before, but they made me this way."  I have tried to avoid her, but she continues to engage me with this topic, and her total disrespect for the management of our company.  I am feeling more and more uncomfortable each time I'm around her, and now dread crossing pasts with her and her 2 large pitbulls that always accompany her to work.
>
> Thank you for your time.
>
> Sincerely, Liam Sullivan

---

posits new facts, the Court declines to include them because they are non-responsive to the contents of PSAMF ¶ 29.

As for Ascentria's qualification that there is no evidence that Mr. Great was willing to do these tasks, the Court agrees with Ascentria and has altered PSAMF ¶ 29 to reflect that Ms. Behlen believed that Mr. Great would be willing to perform these additional job duties.

DSMF ¶ 47; PRDSMF ¶ 47;[8] PSAMF ¶¶ 31-32; DRPSAMF ¶¶ 31-32.

At the time of Mr. Sullivan's email, Ms. Behlen was litigating a lawsuit involving Mr. Sullivan's wife.  PSAMF ¶ 33; DRPSAMF ¶ 33.  The lawsuit in relevant part alleged Mr. Sullivan's wife had discriminated against Ms. Behlen.  PSAMF ¶ 33; DRPSAMF ¶ 33.   The day before Mr. Sullivan wrote the email, Ms. Behlen had a mediation in the lawsuit involving his wife.  PSAMF ¶ 34; DRPSAMF ¶ 34.   Mr. Grant knew that Mr. Sullivan and Ms. Behlen did not like each other because of the lawsuit.  PSAMF ¶ 35; DRPSAMF ¶ 35.

Ms. Sweet forwarded Mr. Sullivan's message to Lori Dexter (Ascentria's Human Resources Director), Scott Morrison (Vice President of Operations – Maine), and Victoria Jones (Human Resources Department), stating "Is there anything in particular I need to do regarding racism?  I have not spoken to [Mr. Grant] yet.  I will try to catch up with him today."  DSMF ¶ 48; PRDSMF ¶ 48; PSAMF ¶ 36; DRPSAMF ¶ 36.  Ms. Sweet did then speak to Mr. Grant about Mr. Sullivan's allegations.  Ms. Sweet reported that Mr. Grant said Ms. Behlen "did not make the specific comment about hiring white people to him."  PSAMF ¶ 45; DRPSAMF ¶ 45.

Ms. Dexter responded asking Ms. Sweet to speak to Mr. Grant, explaining that Mr. Sullivan's email was "extremely concerning and if this is indeed [Ms. Behlen's] attitude, it is totally unacceptable and won't be tolerated."  DSMF ¶ 49; PRDSMF ¶

---

[8]    Ms. Behlen admits DSMF ¶ 47 to the extent that Mr. Sullivan sent the email but denies "the allegations in the email [because Ms.] Sweet reported that" Mr. Grant said that Ms. Behlen "did not make the specific comment about hiring white people to him" and Ms. Behlen "denies the allegations." PRDSMF  ¶ 47.  The Court does not consider the Sullivan email for the truth of its contents but to provide context for Ascentria's response.

49.[9]  Ms. Dexter wrote that Ascentria does not "tolerate bully or harassment of any kind and others at Ascentria have lost their jobs because of it." DSMF ¶ 50; PRDSMF ¶ 50.  Ms. Dexter responded to Ms. Sweet's email, saying "[a]nytime there is an accusation [of] bullying, harassment, or racism, it needs to be documented carefully. Looks like I will definitely be coming back to Maine to handle this one." PSAMF ¶ 37; DRPSAMF ¶ 37.

Ms. Dexter testified that Ascentria took, "all allegations [of racism] really seriously and will look into any, like that kind of thing." PSAMF ¶ 38; DRPSAMF ¶ 38.  Regarding the allegations by Mr. Sullivan, pursuant to Ascentria policy, Ms. Dexter testified, "I was called in because I was in charge of Maine employee relations at that point." PSAMF ¶ 39; DRPSAMF ¶ 39.  Ms. Dexter claims as part of her investigation, she spoke to Mr. Grant, Ms. Sweet, Mr. Sullivan, Ms. Kordak, Mr. Morrison, and Ms. Behlen.  PSAMF ¶ 40; DRPSAMF ¶ 40.[10] Ms. Dexter testified that when she spoke to a witness, "I would have documented it" and it would have been part of her investigative file. PSAMF ¶ 41; DRPSAMF ¶ 41.  Ms. Dexter testified she thought she maintained a folder documenting her investigation.  PSAMF ¶ 42;

---

[9]      Ms. Behlen admits DSMF ¶ 49 to the extent that it accurately reflects an email sent from Ms. Dexter to Ms. Sweet but denies the truth of the allegations referenced in the email.  PRDSMF ¶ 49. The Court overrules Ms. Behlen's objection to DSMF ¶ 49.  Ms. Dexter's email does not assert that the allegations in the Sullivan email are true, only if they are true, they are unacceptable and will not be tolerated.

[10]      PSAMF ¶ 40 did not include Scott Morrison as an individual Ms. Dexter interviewed. Ascentria qualifies PSAMF ¶ 40, saying that "Ms. Dexter also testified she spoke to Scott Morrison as part of the investigation."  DRPSAMF ¶ 40.  Having reviewed the relevant record, the Court accepts Ascentria's qualification and slightly alters PSAMF ¶ 40 to include Mr. Morrison.  Mr. Morrison was Ascentria's Vice President of Operations – Maine.  DSMF ¶ 45; PRDSMF ¶ 45.

DRPSAMF ¶ 42.[11]  Ascentria has been unable to produce Ms. Dexter's investigative file, including documentation of any of her witness interviews.   PSAMF ¶ 43; DRPSAMF ¶ 43.[12]  Mr. Sullivan testified he does not recall the company speaking to him about his email.   PSAMF ¶ 44; DRPSAMF ¶ 44.[13]

Ms. Sweet spoke to Mr. Grant concerning Mr. Sullivan's allegations, and Mr. Grant confirmed that he recalled Ms. Behlen referring to staff members as "the Africans" and said Ascentria "shouldn't hire anyone that has worked at [GBC, another facility] because they are mostly 'Africans.'"  DSMF ¶ 51; PRDSMF ¶ 51.[14]  Ms. Sweet also spoke with Ms. Kordak, who reported that Ms. Behlen referred to Falmouth House becoming "Congoville."  DSMF ¶ 52; PRDSMF ¶ 52.[15]  Ms. Sweet also noted that in a recent email, Ms. Behlen made a comment that "the Africans come in flip [f]lops and say [snow] shoveling isn't in their job description."  DSMF ¶ 53; PRDSMF ¶ 53.

---

[11]     Ascentria qualifies PSAMF ¶ 42, saying "Ms. Dexter testified that she *thought* she had a folder specific to this case."  DRPSAMF ¶ 42 (emphasis in DRPSAMF ¶ 42).  Having reviewed the relevant record, the Court accepts Ascentria's qualification and slightly alters PSAMF ¶ 42 to reflect the record.

[12]     Ascentria qualifies PSAMF ¶ 43, saying that "[a]fter diligent search efforts, no such documents have been found [but] Defendant has produced all non-objectionable documents in its possession that are responsive to Plaintiff's discovery requests."  DRPSAMF ¶ 43.  The Court finds Ascentria's objection beyond the scope of the fact and admits PSAMF ¶ 43.

[13]     Ascentria qualifies PSAMF ¶ 44, saying "Mr. Sullivan testified that he did not recall anyone from Ascentria getting back to him about his email but it was 'definitely possible' that they had done so."  DRPSAMF ¶ 44.  The Court finds Ascentria's qualification beyond the scope of the fact and admits PSAMF ¶ 44.

[14]     Ms. Behlen objects to DSMF ¶ 51, denying she "said that Ascentria should not hire anyone that worked at GBC or another facility because they are mostly 'Africans.'"  PRDSMF ¶ 51.  The Court accepts Ms. Behlen's qualification and slightly alters DSMF ¶ 51 to indicate that the fact reflects only Mr. Grant's recollection of the events.

[15]     Ms. Behlen denies DSMF ¶ 52, saying she "does not recall using the term 'Congoville.'"  PRDSMF ¶ 52.  The Court rejects Ms. Behlen's denial and admits DSMF ¶ 52 because the fact reflects only Ms. Kordak's recollection that Ms. Behlen used this term.

On September 21, 2018, Ms. Dexter, Ms. Kordak, and Ms. Sweet met with Ms. Behlen.   PSAMF ¶ 46; DRPSAMF ¶ 46.   Ms. Dexter testified the meeting was documented with her notes and contained in her investigative file.   PSAMF ¶ 47; DRPSAMF ¶ 47.   In the meeting, management initially told Ms. Behlen that "somebody reported you are saying - you know, making racial slurs."   PSAMF ¶ 48; DRPSAMF ¶ 48.   Management did not tell Ms. Behlen who made the allegations against her.   PSAMF ¶ 49; DRPSAMF ¶ 49.  Ms. Behlen suspected Mr. Sullivan made the allegations in retaliation for her lawsuit involving Mr. Sullivan's wife.   PSAMF ¶ 50; DRPSAMF ¶ 50.  At the meeting, Ms. Behlen heard the allegation of her use of the term "Congoville."   PSAMF ¶ 51; DRPSAMF ¶ 51.   She did not recall ever using the term, but, if she did, it was for geographical reference and not with racial intent. PSAMF ¶ 52; DRPSAMF ¶ 52.  Aside from the "Congoville" comment and noting that Ms. Behlen should not "lump an entire group of people together" based on the behavior of one or two individuals, management did not identify any other specific racial allegations.   PSAMF ¶ 53; DRPSAMF ¶ 53;[16] DSMF ¶ 54; PRDSMF ¶ 54.[17]

[16]     Ascentria qualifies PSAMF ¶ 53, saying that the "Corrective Action Form dated October 6, 2018, also referenced Plaintiff 'lump[ing]' an entire group of people together, based on the behavior of 1 or 2 individuals.'"   DRPSAMF ¶ 53.   Having reviewed the relevant record, the Court accepts Ascentria's qualification and adds to PSAMF ¶ 53 to reflect the record.

[17]     Ms. Behlen admits DSMF ¶ 54 to the extent that "the parties met and discussed the Congoville comment" but denies the discussion "involved any other comments about staff members [because a]side from the 'Congoville' comment, management did not identify any other specific racial allegations."   PRDSMF ¶ 54.   The Corrective Action Form notes both "inappropriate comments that [Ms. Behlen]" made about the African staff" and that she "cannot lump an entire group of people together based on the behavior of 1 or 2 individuals."   *Jt. R. Materials*, Attach 5, *Corrective Action Form* at 1 (*Corrective Action Form*).   Ms. Behlen's response to the Corrective Action Form similarly addresses both the alleged "Congoville" comment and the allegation that she lumps people together based on the behavior of just one or two individuals.   *Jt. R. Materials*, Attach 1, *Email from Behlen to Sweet, Kordak, and Grant Dated September 23, 2018.*   The Court finds that the cited record supports DSMF ¶ 54 and admits the fact.

At the meeting, Ms. Behlen raised the issue of how "Ascentria was lacking in training towards those coming on board, not necessarily Africans, but everyone who came on board." PSAMF ¶ 54; DRPSAMF ¶ 54. At the meeting, Ms. Behlen noted "tardiness" and abiding by "the work ethic that we all should abide by," were important. DSMF ¶ 55; PRDSMF ¶ 55. Ms. Behlen explained that she hoped future diversity trainings would involve standards of "being on time, following the job description, [and] being diligent in the job description." PSAMF ¶ 55; DRPSAMF ¶ 55. Ms. Behlen explained that she had worked with the African population for 30 or 40 years and never had problems. PSAMF ¶ 56; DRPSAMF ¶ 56. Ms. Behlen was extremely upset with the racial allegation, testifying that she was "so plagued by being accused of being a racist." PSAMF ¶ 57; DRPSAMF ¶ 57.

On September 23, 2018, Ms. Behlen sent a follow up email to Ms. Sweet, Mr. Grant, and Ms. Kordak, regarding the meeting the previous Friday. PSAMF ¶ 58; DRPSAMF ¶ 58.[18] In the email, Ms. Behlen stated she did not recall using the term "Congoville," but if she had, and the offended individual brought it to her attention, she "would have quickly apologized realizing it had been offensive and would watch out what [she] say[s]." PSAMF ¶ 59; DRPSAMF ¶ 59; DSMF ¶ 56; PRDSMF ¶ 56. She also stated that she thought this discussion was something that "could have been handled over the phone" and that she hoped that "in future trainings, diversity can

---

[18]     Ascentria qualifies PSAMF ¶ 58, saying Ms. Behlen "also sent the email to Mr. Grant." DRPSAMF ¶ 58. Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 58 to reflect the record.

be emphasized from the American point of view and adapting to our culture; not with us having to adapt to their culture in our country."  DSMF ¶ 57; PRDSMF ¶ 57.

Ms. Dexter concluded that Ms. Behlen did admit to using the term "Africans" to lump all people into one category.  PSAMF ¶ 60; DRPSAMF ¶ 60.  Ms. Dexter was unable to come to any conclusion regarding the allegation of religious choices.  PSAMF ¶ 61; DRPSAMF ¶ 61.  Ms. Dexter was unable to come to any conclusion regarding the allegation that Ms. Behlen stated she wished they would all go back to Africa.  PSAMF ¶ 62; DRPSAMF ¶ 62.

On October 6, 2018, Ms. Kordak delivered a "Corrective Action Form" to Ms. Behlen indicating that Ms. Behlen's alleged comments about African staff were inappropriate, unacceptable, and must end immediately.  PSAMF ¶ 63; DRPSAMF ¶ 63; DSMF ¶ 58; PRDSMF ¶ 58.[19]  The Corrective Action states, "A conversation has been had with you concerning inappropriate comments you have made about the African Staff that you work with. The comments are unacceptable, and it has been discussed with you that you cannot lump an entire group of people together based on the behavior of 1 or 2 individuals."  PSAMF ¶ 65; DRPSAMF ¶ 65.  The warning directed Ms. Behlen to bring concerns of tardiness and performance of other staff directly to her Team Leader.  DSMF ¶ 59; PRDSMF ¶ 59.  The warning further stated that "Should there be any additional incidents related to the topic discussed and now documented regarding inappropriate referencing of the African staff or any other

---

[19]     Ms. Behlen admits DSMF ¶ 58 to the extent that she "received the warning" but denies that she "made comments about the African staff that w[ere] inappropriate and unacceptable" and in fact "sent an email rebutting the Corrective Action."  PRDSMF ¶ 58.  The Court accepts Ms. Behlen's qualification and adds "alleged" to DSMF ¶ 58.

ethnic group, it could lead to additional corrective action up to and including termination." DSMF ¶ 60; PRDSMF ¶ 60.

Ms. Behlen told Ms. Kordak the Corrective Action was based on retaliation from Mr. Sullivan. PSAMF ¶ 64; DRPSAMF ¶ 64. Ms. Behlen refused to sign the documentation of the warning, writing on it that "her accuser did not come forward," and she did not "recall any such statement." DSMF ¶ 61; PRDSMF ¶ 61; PSAMF ¶ 66; DRPSAMF ¶ 66.

On November 4, 2018, Ms. Behlen sent an email rebutting the Corrective Action. PSAMF ¶ 67; DRPSAMF ¶ 67. In the rebuttal, Ms. Behlen again stated she did not recall using the term "Congoville," but if she did it was wrong. PSAMF ¶ 68; DRPSAMF ¶ 68. Ms. Behlen also objected to the implication of being cast as a racist, writing:

> I have done mission work in India and Africa. I lived with a Black American for 11 years and was engaged to an African American and would have married him had it not been for his untimely accidental death. He and I were planning a trip to Angola to do housing for the poor, so the above statement is unjust and unwarranted. How one can make a determination based on an alleged statement concerns me…

PSAMF ¶ 69; DRPSAMF ¶ 69.

Ms. Behlen also objected to relating her complaints about work ethics to a bias against Africans, writing:

> Any negative commentary made by me had nothing to do with Africans or color (I wouldn't care if they were green or white; it has to do with unethical work performance among other concerns. After bringing the concerns to the persons involved, I brought ALL concerns to the then team leader, Mike Moore and Dave Sturtevant—OFTEN—and nothing changed, Tardiness continue(d)(s), provoking the client continued, videotaping continued, obsessive cell phone usage (often time with more

than one phone continues) and taking clients to do their own personal errands continued and most likely still continues.  I was and am diligent in reporting issues—the concern goes nowhere!

PSAMF ¶ 70; DRPSAMF ¶ 70.

On November 4, 2018, Ms. Behlen followed up in an email with the subject line "Verbal" Corrective Action Form, stating: "To reiterate my earlier e-mail to [Ms. Kordak] . . . I don't recall saying the word 'Congoville' or in what context, but I can say this – had the individual who had been offended brought it to my attention, I would have quickly apologized realizing it had been offensive to them and would watch what I say more astutely (particularly around that person)."  DSMF ¶ 62; PRDSMF ¶ 62.   Ms. Behlen further noted in the email:

> **Specific Rule and/or Performance Expectation Violated**
> Ascentria takes pride in hiring a diverse workforce.  The expectation is that no specific group will be targeted or identified in a negative way.
> **My Response:**
> I concur totally with the above statement of taking pride in hiring a diverse workforce.  However, when the diverse workforce operates in a totally different work ethic, it becomes a problem.  Punctuality, cell phone usage, doing personal errands while at work continue to name a few.

DSMF ¶ 63; PRDSMF ¶ 63.   Ms. Behlen further admitted to referring to "African time" when speaking with one of her co-workers.  DSMF ¶ 64; PRDSMF ¶ 64.   Ms. Dexter was disappointed in Ms. Behlen's takeaways from the meeting and felt that her closing comment that diversity be "emphasized from the American point of view and adapting to OUR culture," spoke volumes.  DSMF ¶ 65; PRDSMF ¶ 65.[20]

---

[20]    Ms. Behlen admits DSMF ¶ 65 to the extent that Ms. Dexter "wrote the sentiment" but "den[ies] that [her] comment about adapting to the American point of view or culture was in any way

**E.      Rebecca Behlen's 2019 Interactions with Supervisors at Falmouth House**

Ms. Dexter testified that by March of 2019 she was monitoring Ms. Behlen's behavior, "[d]efinitely staying in touch and seeing how things were going. [Ms. Sweet] was—it seems fine, no more comments kind of thing." PSAMF ¶ 71; DRPSAMF ¶ 71.

On February 17, 2019, Ms. Behlen emailed Ms. Katembe and Dori Upham regarding medication and dietary concerns of one of the clients, RM, noting that the "Staff here are slowly killing RM" based on his weight gain. DSMF ¶ 30; PRDSMF ¶ 30. In her signature she referred to herself as "Becky Behlen Official PIA," which she later stated stood for "Pain in the Ass." DSMF ¶ 31; PRDSMF ¶ 31. On March 10, 2019, Ms. Behlen reported to Ms. Sweet that a co-worker had posted a picture of clients on Facebook. DSMF ¶ 32; PRDSMF ¶ 32.

On March 25, 2019, Ms. Behlen sent Ms. Sweet, Ms. Katembe, Mr. Grant, Mr. Morrison, and Angela Boville (Ascentria's CEO) an email with the subject "Cracked Tile in Bathroom." DSMF ¶ 33; PRDSMF ¶ 33. The "Cracked Tile in Bathroom" email reported concerns as to "Material Needs" of one of the clients as well as "Repairs and Cleanup Needed" at Falmouth House and how the issues would result in neglect if nothing was done. DSMF ¶ 34; PRDSMF ¶ 34. The email provided in part:

> **Repairs and Cleanup Needed**
> 1. Ceramic floor tiles in the upstairs bathroom are badly cracked (RM cracked the tiles when stomping during behaviors)
> 2. Upstairs cupboard doors (entirely off on chemical storage and another partially off on the opposite side in kitchen)
> 3. Med door in the basement needs repair – it won't shut unless you lift it up and then hope it locks.

---

racial." PRDSMF ¶ 65. The Court finds Ms. Behlen's objection beyond the scope of the fact and admits DSMF ¶ 65.

> 4. Upstairs Balcony door won't lock
> 5. Old appliances and furniture stored upstairs and in the garage
> – old refrigerator and chair upstairs, washing machine,
> microwave, old beds, collapsed garage door in the garage.
> 6. Med closet upstairs has no light (nor the hallway – someone
> had mentioned it was an electrical issue)
> 7. The furnace went out again this weekend. If the hot water
> hadn't stopped, I would have had no idea the furnace was down.
> I went down and restarted it and it appeared to be okay, but it
> needs yearly maintenance.
>
> **RM's Material Needs**
> 1. New sheets, pillows, blankets (RM currently has only one set of
> WORN sheets and has a blanket that he moved in with in
> addition to two relatively new blankets purchased within the last
> 5 years).
> 2. Desp[e]r[a]tely needs a new dresser (3 of the drawers have no
> front)
> 3. Needs new underclothes and socks

DSMF ¶ 35; PRDSMF ¶ 35; PSAMF ¶ 72; DRPSAMF ¶ 72.  In the email, Ms. Behlen

concluded by noting she has constantly brought these issues to the attention of her

superiors and the issues are not resolved, before stating:

> Really, the bottom line is this: Would I live in a house like Falmouth (the
> way it currently is) – absolutely NOT.  Why should our consumers be
> forced to live in these conditions.  I understand money is always a factor,
> but if staff would take pride in their workplace as they do in their own
> home, less maintenance would be required.

PSAMF ¶ 73; DRPSAMF ¶ 73.  In response, Mr. Morrison, emailed Neal Wynne,[21]

with Ms. Sweet and Ms. Katembe in copy, writing "Unfortunately, [Ms. Behlen] likes

to embellish the facts."  PSAMF ¶ 74; DRPSAMF ¶ 74.  In his email, Mr. Morrison

also assured that Mr. Grant and Ms. Katembe would address the issues raised by Ms.

---

[21]     The parties do not identify Mr. Wynne's position at Ascentria; however, the record reflects that
he was Ascentria's Facilities Manager.  *Aff. of Guy Loranger*. Attach. 7, *Email String* at 1, *Email from
Neal Wynne to Scott Morrison* (Apr. 2, 2019).

Behlen.  PSAMF ¶ 75; DRPSAMF ¶ 75.  In a follow-up email, Ms. Behlen noted "each and every item in [her] email was addressed by [her] and others multiple times." DSMF ¶ 36; PRDSMF ¶ 36.  Ms. Katembe responded that she was previously aware of all the concerns listed as to RM's Material Needs and had received money that day, March 25, to begin to remedy the concerns.  DSMF ¶ 37; PRDSMF ¶ 37.

That same day, March 25, 2019, Ms. Behlen sent an email to Ms. Upham[22] with the subject "MEDS/MAR," noting that "meds and doctor's orders at Falmouth are such a mess" and that she "contacted the management about the tiles so we will see how long it will take to correct.  Of course, I brought this to their attention months ago and it remained unaddressed.  If it isn't corrected, it is nothing short of neglect." DSMF ¶ 38; PRDSMF ¶ 38.  On Wednesday, March 27, 2019, Ms. Behlen sent an email to Ms. Upham with the subject "MARS" regarding staff members missing CRMA certificates and a belief that staff during the week would not care for a client injury.  DSMF ¶ 39; PRDSMF ¶ 39.

On April 7, 2019, Ms. Behlen sent an email with the subject "RM's Meds" to Ms. Upham indicating that Dr. Harper's med list was inaccurate as to RM and that SN needed a sunscreen Standing Order.  DSMF ¶ 40; PRDSMF ¶ 40.  In a follow-up email to Ms. Behlen's April 7 concerns, on April 8, 2019, Ms. Behlen sent an email to Ms. Upham stating:

> Hi Dori,
> Thanks for your attention to this – I always follow the chain of command, but the MARS have been a mess for so long that it really is

---

[22]   The parties do not identify Ms. Upham's position at Ascentria; however, the record reflects that Ms. Upham is Dori Ann Upham, RN, BSN, and she is designated as a Nursing Consultant for Ascentria Care Alliance Maine.  *Aff. of Tawny L. Alvarez*, Attach. 9, *Production Excerpts* at 34.

concerning.  I agree 100% that maintaining the books is part of the responsibility with the CRMA, however, this responsibility should lie with whoever takes the client to the doctor – not left for others to do!! At Falmouth, the orders (if received) are generally put in the front of the book as it would take an extra step to put them where they actually belong.  It is sheer laziness and it is imperative that the team leader or whomever follows up with the protocols of putting things in the book.

In all my years at Falmouth, I haven't seen it this bad as it is now. Also, the med list from Harper for RM is inaccurate as it is current with the psychotropics from Jen O'Connor although it does have Tylenol on it so we at least can give for pain if he requests it in the future.

In general, RM's health has declined quite a bit in the last year so it is imperative that staff stay on top of his meds and observing any differences in him – his walking and gait has changed considerably. This is no grievance or complaint against you Dori – it is about LAZY staff (and I am not talking about Sharon or the new staff).

Here's the email we chatted about

Thanks for your attention to this!!

B.

DSMF ¶ 41; PRDSMF ¶ 41.

On May 11, 2019, Ms. Behlen sent an email to Ms. Katembe and copied Mr. Grant and Ms. Sweet, writing: "I know you have requested no emails, but I cannot contain myself.  Also, sending emails allows the paper trail needed for dates, etc." PSAMF ¶ 76; DRPSAMF ¶ 76.  In the email, Ms. Behlen then noted many of the safety issues from her March 25th email remained unresolved.  PSAMF ¶ 77; DRPSAMF ¶ 77.  Ms. Katembe responded to Ms. Behlen, writing "It would be great if sometimes you can acknowledge and appreciate what the team leader and other staff have accomplished so far at the program."  PSAMF ¶ 78; DRPSAMF ¶ 78.  On May 12, 2019, Ms. Behlen presented Ascentria with additional concerns as to client care.  DSMF ¶ 42; PRDSMF ¶ 42.  Mr. Grant testified that by May, he had become

frustrated with Ms. Behlen reporting to upper management about all the problems at the Falmouth House.  PSAMF ¶ 79; DRPSAMF ¶ 79.

On Thursday, June 20, 2019, Ms. Behlen sent an email to Ms. Katembe and Mr. Grant (cc'ing Ms. Sweet) with the subject "Falmouth." PSAMF ¶ 80; DRPSAMF ¶ 80.   Ms. Behlen initially wrote, "Greeting! I hate to write emails, but phone calls don't cut it!!"  PSAMF ¶ 80; DRPSAMF ¶ 80.  She then wrote, "when I came into Falmouth today, I was greeted by [Mr. Sullivan] who was alone (apparently because Gladys has another job (Mon.-Friday) and she has to leave early) . . . the trash in the bathroom was overflowing, the dishwasher was dirty and not run etc."  PSAMF ¶ 81; DRPSAMF ¶ 81.

> In the almost 13 years I have been at Falmouth, this is by far the worst it has ever been (and I am not alone in these sentiments).  I believe the reasons are this: new staff don't follow the client's protocols/routines (the majority march to their own drum doing as minimal amount of work as possible and interacting with clients even less); their diets are the worst they have ever been since many declare "I don't cook" so they don't . . . Basic tasks such as cleaning and laundry is at an all-time low.; and last but not least, the documentation does NOT reflect where and what was done…It is clear that the majority just look at Falmouth as just a job and when approached with how to improve they become indignant and defensive.  Because I am NOT their boss, they clearly feel they do not need direction from me so it needs to come from above.
>
> There is no accountability and/or responsibility for what is happening here and it isn't [Mr. Grant]'s fault.  I know he has attempted to change things here, but the staff have given him a difficult time and his hands are tied unless it comes from the top . . . I realize there is a shortage of staff; however, that shouldn't mean that we just hire a body. . ..

DSMF ¶ 43; PRDSMF ¶ 43; PSAMF ¶¶ 82-83; DRPSAMF ¶¶ 82-83.[23]  Ms. Behlen closed by writing:

> This is only the tip of the iceberg, but I had to vent.  I am so disappointed in in what is occurring here at Falmouth – a one-time well-oiled machine has become a wheel with half the spokes missing.

PSAMF ¶ 84; DRPSAMF ¶ 84.[24]  Ascentria presented no evidence it took any action in response to the substance of the issues raised in Ms. Behlen's June 20th email. PSAMF ¶ 85; DRPSAMF ¶ 85.

On July 9, 2019, in an email with the Subject "SN – Falmouth," Ms. Behlen emailed Ms. Sweet to complain about concerns regarding a resident of Falmouth House, "SN."  DSMF ¶ 44; PRDSMF ¶ 44.  In August 2019,[25] Ms. Sweet emailed Mr. Morrison, Ascentria's Maine Vice President of Operations, regarding concerns that she had received from Ms. Kordak that Ms. Behlen was "being what [Ms. Kordak] considered to be racist."  DSMF ¶ 45; PRDSMF ¶ 45.

## F.   Rebecca Behlen's Alleged Misconduct After the Disciplinary Warning

---

[23]     Ascentria qualifies PSAMF ¶ 83, saying the "quoted excerpt contains several grammatical and punctuation differences from the original email" but "admits that Page ID #286 contains an accurate copy of the cited material."  DRPSAMF ¶ 83.   Although Ms. Behlan does not quote the entire June 20, 2019 email to Ms. Katembe, Ms. Grant, and Ms. Sweet, the Court disagrees that the quoted portion contains grammatical and punctuation differences with the actual email — at least in the reformatted version in the record.

[24]     Ascentria qualifies PSAMF ¶ 84, saying the "quoted excerpt contains several grammatical and punctuation differences from the original email" but "admits that Page ID #286 contains an accurate copy of the cited material."  DRPSAMF ¶ 84.   Although Ms. Behlan does not quote the entire June 20, 2019 email to Ms. Katembi, Ms. Grant, and Ms. Sweet, the Court disagrees that the quoted portion contains grammatical and punctuation differences with the actual email — at least in the reformatted version in the record.

[25]     DSMF ¶ 45 states the date as August 2018.  PRDSMF ¶ 45 admits DSMF ¶ 45 without qualification.  Based on the chronology of the submitted facts, the Court believes this should be August 2019.  The Court alters DSMF ¶ 45 to reflect what the Court concludes is the year intended to be associated with the fact.

On June 24, 2019, Mr. Grant emailed Ms. Katembe with a report that Ms. Behlen had been making what he believed were "questionable comments." PSAMF ¶¶ 86-87; DRPSAMF ¶¶ 86-87; DSMF ¶ 66; PRDSMF ¶ 66.[26] Specifically, Mr. Grant told Ms. Katembe that she had "vocalized her displeasure with certain staff at Falmouth house" and called Mr. Grant to "run through a list of complaints," asking if Ascentria "could be hiring more white people or if they even apply, because if we keep bringing in more Africans the quality of work is going down." PSAMF ¶ 88; DRPSAMF ¶ 88; DSMF ¶ 67; PRDSMF ¶ 67.[27] Ms. Behlen says that Mr. Grant's allegations are false, and she made no such statements, as she recalls knowing such language was prohibited by her Corrective Action the previous fall. PSAMF ¶ 89; DRPSAMF ¶ 89.[28]

Mr. Grant also told Ms. Katembe that Ms. Behlen said "she can't say these things to you or [Ms. Sweet] because she would get in trouble but she felt she could say it to me"; Ms. Behlen denies having made this statement. DSMF ¶ 68; PRDSMF ¶ 68.[29] Mr. Grant wrote that he felt that Ms. Behlen's comments were unacceptable;

---

[26]   Ms. Behlen admits DSMF ¶ 66 to the extent that Mr. Grant "sent the email" but denies that Ms. Behlen "had been making questionable comments." PRDSMF ¶ 66. The Court amends DSMF ¶ 66 to clarify that the comments were questionable in Mr. Grant's opinion.

[27]   Ms. Behlen admits DSMF ¶ 67 to the extent that Mr. Grant "made the allegations" but denies the allegations as "a fabrication created in retaliation for [Ms.] Behlen's June 20, 2019, email." PRDSMF ¶ 67. The Court has included not only Mr. Grant's allegation but also Ms. Behlen's denial.

[28]   PSAMF ¶ 89 reads "Mr. Grant's allegations are false. Ms. Behlen made no such statement, knowing such language was prohibited given her Corrective Action the previous fall." Ascentria denies PSAMF ¶ 89, saying "[Mr.]Grant testified that [Ms.] Behlen made the comments he reported in his email regarding hiring more white people." DRPSAMF ¶ 89. The Court accepts as facts that Mr. Grant made the accusations, and that Ms. Behlen denies having made the statements and contends that Mr. Grant's accusations are false.

[29]   Ms. Behlen admits DSMF ¶ 68 to the extent that Mr. Grant "made the allegations" but denies the allegations as "a fabrication created in retaliation for [Ms.] Behlen's June 20, 2019, email." PRDSMF ¶ 68. The Court accepts as facts that Mr. Grant made the accusations, and that Ms. Behlen denies having made the statements and contends that Mr. Grant's accusations are false.

Ms. Behlen denies having made the comments Mr. Grant was referring to.  DSMF ¶ 69; PRDSMF ¶ 69.[30]  Mr. Grant is not white.  DSMF ¶ 70; PRDSMF ¶ 70.[31]  Upon receiving Mr. Grant's email, Ms. Katembe forwarded it to Ms. Dexter requesting directions as to next steps.  DSMF ¶ 71; PRDSMF ¶ 71.  Ms. Dexter followed up with Ms. Katembe by email and may have connected with Mr. Grant.  DSMF ¶ 72; PRDSMF ¶ 72.[32]

Ms. Dexter claims Ascentria investigated Mr. Grant's June 24, 2019 email.  PSAMF ¶ 90; DRPSAMF ¶ 90.  Ms. Dexter claims she conducted the investigation.  PSAMF ¶ 91; DRPSAMF ¶ 91.  Ms. Dexter claims her investigation consisted of speaking to Mr. Grant and Ms. Katembe.  PSAMF ¶ 92; DRPSAMF ¶ 92.  She claims that Mr. Grant's girlfriend heard his conversation with Ms. Behlen when she made the alleged racist comments.  PSAMF ¶ 93; DRPSAMF ¶ 93.  Ms. Dexter did not speak to the girlfriend or even obtain her name.  PSAMF ¶ 94; DRPSAMF ¶ 94.  Ms. Dexter testified she documented her subject discussions.  PSAMF ¶ 95; DRPSAMF ¶ 95.  Ms. Dexter testified she held a meeting with Ms. Behlen at which she would have

---

[30]    Ms. Behlen admits DSMF ¶ 69 to the extent that Mr. Grant "made the allegations" but denies the allegations as "a fabrication created in retaliation for [Ms.] Behlen's June 20, 2019, email."  PRDSMF ¶ 69.  The Court accepts as facts that Mr. Grant made the accusations, and that Ms. Behlen denies having made the statements and contends that Mr. Grant's accusations are false.

[31]    Ms. Behlen qualifies DSMF ¶ 70, saying Mr. Grant is "Hawaiian-American, born on the island of Oahu in the Hawaiian Islands."  PRDSMF ¶ 70.  The Court finds Ms. Behlen's qualification beyond the scope of the fact and admits DSMF ¶ 70.

[32]    DSMF ¶ 72 states in part that Ms. Dexter "reported that she reached out to Grant to discuss Plaintiff's statements."  Ms. Behlen denies DSMF ¶ 72, saying Mr. Grant "testified [that] after he sent the email no one from the company subsequently interviewed him about [Ms.] Behlen's behavior or the alleged racial comments" in person.  PRDSMF ¶ 72.  Against Mr. Grant's memory is an email from Lori Dexter to Ms. Katembe stating that she had connected with Mr. Grant to discuss "the ongoing boundary issues that Becky has."  *Katembe Dep.*, Ex. 8.

    Having reviewed the record, the Court accepts Ms. Behlen's qualification and has slightly amended DSMF ¶ 72 to reflect the full record.

gone through the allegations.  PSAMF ¶ 96; DRPSAMF ¶ 96.[33]  According to Ms.

Behlen, she was never interviewed by Ms. Dexter.  PSAMF ¶ 97; DRPSAMF ¶ 97.[34]

Ms. Behlen did not become aware of the complaint made against her by Mr. Grant in

June of 2019 until she was terminated.  PSAMF ¶ 98; DRPSAMF ¶ 98.[35]

Ascentria has been unable to produce Ms. Dexter's investigative file, her

investigative notes, or any documentation reflecting any witness interviews.  PSAMF

¶ 99; DRPSAMF ¶ 99.[36]  Mr. Grant testified that after he sent the email, no one from

the company subsequently interviewed him or spoke to him in person about Ms.

Behlen's behavior or the alleged racial comments.  PSAMF ¶ 100; DRPSAMF ¶ 100.[37]

Ms. Dexter reiterated that Ms. Behlen had been previously warned about her

derogatory statements regarding African staff members and that targeting certain

groups of people as she had done contradicted the core values of Ascentria.  DSMF ¶

73; PRDSMF ¶ 73.[38]  Ms. Dexter deferred to Ms. Katembe as to whether she wanted

---

[33]  Ascentria qualifies PSAMF ¶ 96, saying "Ms. Dexter indicated she 'would have' gone through the allegations but could not remember what they discussed specifically."  DRPSAMF ¶ 96.  Having reviewed the relevant record, the Court accepts Ascentria's qualification and slightly alters PSAMF ¶ 96 to reflect the record.

[34]  Ascentria qualifies PSAMF ¶ 97, saying "[Ms.] Dexter recalls speaking with Plaintiff regarding the allegations."  DRPSAMF ¶ 97.  The Court accepts Ascentria's qualification and slightly alters PSAMF ¶ 97 to reflect the record.

[35]  Ascentria qualifies PSAMF ¶ 98, saying "[Ms.] Behlen testified that she became aware of [Mr.] Grant's email 'when [she] was terminated and . . . received a copy of that email in the unemployment records.'"  DRPSAMF ¶ 98.  Having reviewed the relevant record, the Court accepts Ascentria's qualification and slightly alters PSAMF ¶ 98 to reflect the record.

[36]  Ascentria qualifies PSAMF ¶ 99, saying "[a]fter diligent search efforts, no such documents have been found.  Defendant has produced all non-objectionable documents in its possession that are responsive to Plaintiff's discovery requests."  DRPSAMF ¶ 99.  The Court finds Ascentria's objection beyond the scope of the fact and admits PSAMF ¶ 99.

[37]  Ascentria qualifies PSAMF ¶ 100, saying "[Mr.] Grant testified that he did not remember whether he and anyone from the company had the opportunity to 'sit down and talk' about [Ms.] Behlen's comments, but he thought he received a few emails following up on his email."  DRPSAMF ¶ 100.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 100 to reflect the record.

[38]  Ms. Behlen admits DSMF ¶ 73 to the extent that she "had received a prior Corrective Action" but denies that she "made derogatory comments regarding African staff members and targeting

to issue Ms. Behlen a final written warning or proceed with termination.  DSMF ¶ 74; PRDSMF ¶ 74.

### G.    Rebecca Behlen's Termination

In a July 6, 2019 email from Ms. Sweet to Ms. Katembe, Ms. Sweet asked: 1) "Do you feel she is racist?"; 2) ["]Do you think she is chasing others out?" and 3) "Would the program be better off if she were gone?"  DSMF ¶ 75; PRDSMF ¶ 75; PSAMF ¶ 106; DRPSAMF ¶ 106.   Ms. Katembe responded: "Yes to all those questions."  DSMF ¶ 76; PRDSMF ¶ 76.[39]

Ms. Katembe mostly had contact with Ms. Behlen during monthly team meetings.  PSAMF ¶ 107; DRPSAMF ¶ 107.[40]   Ms. Katembe described Ms. Behlen's job performance as:

> really good with clients and also I think that comes with experience in that program because she has been in that program for a long time, so she was really good with the clients. And it comes also from the trust because with clients, the more they see you, they form a trust, so she was good in her documentation and communication.

PSAMF ¶ 108; DRPSAMF ¶ 108.[41]  Ms. Katembe testified she had no problems with Ms. Behlen's job performance.  PSAMF ¶ 109; DRPSAMF ¶ 109.  At her deposition,

---

certain groups of people." PRDSMF ¶ 73.  The Court finds Ms. Behlen's objection beyond the scope of the fact and admits DSMF ¶ 73.

[39]    Ms. Behlen admits that DSMF ¶ 76 accurately reflects the record but "den[ies] the allegations." PRDSMF ¶ 76.  The Court finds Ms. Behlen's objection beyond the scope of the fact and admits DSMF ¶ 76.

[40]    Ascentria qualifies PSAMF ¶ 107, saying "[Ms.] Katembe testified that she oversaw [Ms.] Behlen and, when asked how much contact she had with [Ms.] Behlen, stated, 'Mostly if we have team meetings, which we tried to do it monthly.  Depending on the shift, I always do a weekly check, so if it happens to be on her shift, then I will happen to see her.'"  DRPSAMF ¶ 107 (quoting *Jt. R. Materials*, Attach 18, *Ex. Excerpts from Katembe's Deposition* at 9:18-10:1 (*Katembe Dep.*).  The Court finds that the record supports PSAMF ¶ 107 and admits the fact.

[41]    Ascentria qualifies PSAMF ¶ 108, saying "[t]he quoted excerpt contains differences in wording from the deposition testimony, but Defendant admits that Page ID #289 at 11:7-24 contains testimony

Ms. Katembe testified the primary basis for believing Ms. Behlen was a racist was the alleged comment Ms. Behlen made to Mr. Grant.  PSAMF ¶ 110; DRPSAMF ¶ 110.[42]  Ms. Katembe was aware of Ms. Behlen's reports about the conditions of the Falmouth House and believed Ms. Behlen was credible in her reports.  PSAMF ¶ 111; DRPSAMF ¶ 111.  Ms. Katembe testified that prior to Mr. Grant's June 24th email, she does not recall Mr. Grant telling her or complaining about Ms. Behlen making racist comments.  PSAMF ¶ 112; DRPSAMF ¶ 112.

Sometime between July 5 and July 8, 2019, after consulting with Ms. Sweet, Ms. Katembe made the decision that Ascentria should proceed with termination. DSMF ¶ 77; PRDSMF ¶ 77; PSAMF ¶ 113; DRPSAMF ¶ 113.[43]  Ms. Katembe communicated this to Ms. Dexter with Mr. Grant in copy on July 8, 2019.  DSMF ¶ 78; PRDSMF ¶ 78.

On or about July 6 or 7, 2019, Ms. Behlen observed one the residents with a black eye and a droopy lip.  PSAMF ¶ 101; DRPSAMF ¶ 101.  According to Ms. Behlen, the resident looked like he "had been abused, [h]e had a black eye, and the bruise was around his lip . . . it looked bad," and the client said Mr. Grant "did it.  He

---

of [Ms.] Katembe about [Ms.] Behlen's performance."  DRPSAMF ¶ 108.  The Court modifies PSAMF ¶ 108 to reflect the record and admits PSAMF ¶ 108.

[42]     Ascentria denies PSAMF ¶ 110, saying "[Ms.] Katembe testified that she felt [Ms.] Behlen was racist '[b]ecause of the comment she made in the presence of [Mr. Grant] and also that was not the first time." DRPSAMF ¶ 110 (quoting *Katembe Dep.* at 28:21-25).  The Court accepts Ascentria's denial as a qualification and slightly alters PSAMF ¶ 110 to reflect the record.

[43]     Ms. Behlen denies DSMF ¶ 77, saying "Ascentria asserted that sometime between July 5th and July 8th, [Mr.] Grant and [Ms.] Katembe met and decided to terminate [Ms.] Behlen." PRDSMF ¶ 77 (citing *Jt. R. Materials*, Attach 13, *Def.'s Objs. and Resps. to Pl.'s Second Set of Interrogs. to Def.* at 5).  The Court accepts Ms. Behlen's denial as an objection and slightly alters DSMF ¶ 77 to reflect the record.

punched him."[44]   PSAMF ¶¶ 102-103; DRPSAMF ¶¶ 102-103.   On July 7, 2019, Rudolph Naples—the brother and legal guardian of the resident SN—emailed Ms. Sweet, writing:

> First, I'm VERY UPSET by this.  This is SERIOUS.  This morning when I arrived at Falmouth house to visit SN I noticed this new second face injury in just a few days (Photo attached) . . . [SN] said AJ also did this injury to him Friday morning.  I had very negative calls Friday with AJ about a car for SN…Given the injuries, SN isn't safe with AJ, or SN's assigned staff last Wednesday and Friday . . . SAFE STAFFING FOR SN NEEDS TO FOR SN NEEDS TO BE ADDRESSED IMMEDIATELY.

PSAMF ¶ 104; DRPSAMF ¶ 104.[45]  On July 9, 2019, Ms. Behlen emailed Ms. Sweet "out of concern for SN at Falmouth," and described the agitated state in which she found SN, as well the bruises to his face.  PSAMF ¶ 105; DRPSAMF ¶ 105.

Ascentria notified Ms. Behlen of her termination via a letter dated July 23, 2019, and in a meeting with Mr. Morrison, Ms. Katembe, and Ms. Jones.   DSMF ¶ 81; PRDSMF ¶ 81.  After the termination meeting, Ms. Behlen sent an email to Ms. Katembe reiterating that, "as I told you this morning, I had no idea an investigation was even occurring as of yet…whoever mentioned to you that I informed them about an investigation is a liar."  PSAMF ¶ 114; DRPSAMF ¶ 114.[46]  In the email, Ms. Behlen also wrote,

---

[44]    Ascentria admits PSAMF ¶ 102-103 "to the extent Plaintiff believes this to be true." DRPSAMF ¶ 102-103.  The Court slightly alters PSAMF ¶ 102-103 to indicate that this fact reflects Ms. Behlen's opinion.

[45]    Ascentria qualifies PSAMF ¶ 104, saying "[t]he quoted excerpt contains several differences in wording from the original" but "admits that Page ID #258 is an accurate copy of the cited material." DRPSAMF ¶ 104.  The Court alters PSAMF ¶ 104 to reflect the record and admits the fact.

[46]    Ascentria qualifies PSAMF ¶ 114, saying "[t]he quoted excerpt is not an exact excerpt of the record evidence."  DRPSAMF ¶ 114.  The Court slightly alters PSAMF ¶ 114 to reflect the record and admits the fact.

This along with the "alleged racism," seems to be linked together. It is apparent I just made too much noise about the lack of caring and quality of the recent employees (except Eda who was exceptional, but of course was not provided the hours). As I have said to AJ many times, I don't/didn't care if someone was green and white polka dots if they did their job. What is currently happening is a serious decline—poor diet, client lack of attention, cell phone and computer abuse, no cleaning, no documentation (even though told documentation is imperative), can't speak English; if they can't speak English, passing meds is problematic…"

PSAMF ¶ 115; DRPSAMF ¶ 115.[47]

On July 18, 2019, Mr. Grant emailed Ms. Sweet:

Hi [Ms. Sweet],

Sorry to be emailing you but I wanted to let you know about some comments that [Ms. Behlen] made this evening in regards to [Ms. Kordak].

[Ms. Behlen] called into Falmouth, like she does every week to get an update on the house and to see who is working this Sunday, as she doesn't want to be "surprised". I had sent out a text to staff here about a staff meeting next week per [Ms. Katembe] and [Ms. Behlen] asked what it was for. I told her that it was mandatory per [Ms. Katembe] and not wanting to tell her I was stepping down I mentioned that [Ms. Kordak] was stepping down and [Ms. Katembe] would be getting busier and there was going to be some changes that she wanted to go through with staff. [Ms. Behlen] then commented that she was relieved that [Ms. Kordak] was leaving because she feels that [Ms. Kordak] is biased, more specifically "color biased." She said that [Ms. Kordak] clearly favors "the Africans" and [Ms. Behlen] made mention of the whole Congoville thing and how it still ruffles her feathers. She also said that [she] hope[s] that "the next one" in [Ms. Kordak]'s role isn't African because they will more than likely have these same biases.

I did call [Ms. Kordak] to let her know what was said because I would want to know if someone was saying this about me. I know we are moving forward with a termination for [Ms. Behlen], but needless to say, these comments are completely unacceptable. Just felt you should know.

Thank you

[Mr. Grant]

---

[47]    Ascentria qualifies PSAMF ¶ 115, saying "[t]he quoted excerpt contains differences in wording from the deposition testimony," but "admits that Page ID #267 is an accurate copy of the cited material." DRPSAMF ¶ 115. The Court slightly alters PSAMF ¶ 115 to reflect the record and admits the fact.

DSMF ¶ 80; PRDSMF ¶ 80.[48]  Ms. Kordak stepped down from her position on August 3, 2019, and Mr. Grant remains employed at Ascentria.  DSMF ¶ 79; PRDSMF ¶ 79.[49]

### H.    After Rebecca Behlen's Termination

On July 28, 2019, Mr. Naples emailed Ms. Behlen after her termination, complaining that the way Ascentria treated her was "awful."   PSAMF ¶ 116; DRPSAMF ¶ 116.  Mr. Naples then described the chaotic situation at the Falmouth House over the past few days.  PSAMF ¶ 117; DRPSAMF ¶ 117.[50]

On or about December 30, 2019, the Unemployment Commission handling Ms. Behlen's Appeal of an earlier denial of her Employment Benefits found in her favor. PSAMF ¶ 118; DRPSAMF ¶ 118.  The Commission found that the Ascentria had not met its burden of proving that Ms. Behlen's conduct met the statutory definition of misconduct.   PSAMF ¶ 118; DRPSAMF ¶ 118.   The Commission found that Ms. Behlen's firsthand testimony regarding events which led to her separation were credible and convincing.  PSAMF ¶ 118; DRPSAMF ¶ 118.  The opinion also stated:

> The Commission concludes that the Program Manager, Executive Director, and Operations Officer may have been motivated to terminate the Complainant's employment due to her vocal complaints (Memorialized in written emails) about both the failure of certain staff to do their job plus inadequate maintenance of the Falmouth House.

---

[48]    Ms. Behlen admits DSMF ¶ 80 to the extent that "[Mr.] Grant sent the email" but "[d]en[ies] the allegations."  PRDSMF ¶ 80.  The Court finds Ms. Behlen's objection beyond the scope of the fact and admits DSMF ¶ 80.

[49]    Ms. Behlen denies DSMF ¶ 79, saying [Ms.] Kordak left employment with Ascentria on 08/03/19 and [Mr.] Grant is still employed by Ascentria."  PRDSMF ¶ 79.  Having reviewed the relevant record, the Court accepts Ms. Behlen's denial as a qualification and alters DSMF ¶ 79 to reflect the record.

[50]    Ascentria qualifies PSAMF ¶ 117, saying "[Mr.] Naples described what had occurred that day at Falmouth House but did not refer to it as 'turmoil.'"  DRPSAMF ¶ 117.  The Court accepts Ascentria's qualification and slightly alters PSAMF ¶ 117 to reflect the record.

PSAMF ¶ 118; DRPSAMF ¶ 118.

After Ms. Behlen's termination and during the unemployment proceedings, Ms. Behlen saw a Corrective Action Form in relation to her termination that summarized the basis for her termination, including the comments reported by Mr. Grant, the fact that Ms. Behlen was subject to a prior 2018 Corrective Action Form "about the same topic of categorizing an entire culture of people, specifically Africans, as lazy and poor performers," and expectation stated in the prior corrective action that such behavior had to end immediately.  DSMF ¶ 82; PRDSMF ¶ 82.[51]

## I.    Incidents of Racial Comments by Other Employees

Ascentria identified the following employees employed in Maine who made racist comments in the workplace during the time Ms. Behlen was employed by Ascentria: Ember Fogg, Patrick Ungo, Rebecca Behlen, Thomas Edwards, and Carol Rioux.  PSAMF ¶ 119; DRPSAMF ¶ 119.[52]  Except for Ms. Behlen, Ascentria has not taken any action against the remaining employees who made racists comments in the workplace.  PSAMF ¶ 120; DRPSAMF ¶ 120.[53]

---

[51]    Ms. Behlen denies DSMF ¶ 82, saying that she did not "receive[] the Corrective Action" at the time of her termination but instead saw it only during the unemployment proceedings.  PRDSMF ¶ 82.  Having reviewed the relevant record, the Court slightly alters DSMF ¶ 82 to reflect the record.

[52]    Ascentria qualifies PSAMF ¶ 119, saying "[t]he employees identified were employees who were employed in Maine and have been identified as making racist comments in the workplace during the time Plaintiff was employed."  DRPSAMF ¶ 119.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 119 to reflect the record.

[53]    Ascentria qualifies PSAMF ¶ 120, saying Ascentria "stated it was further investigating the response to comments allegedly made by Thomas Edwards and Carol Rioux."  DRPSAMF ¶ 120.  Having reviewed the relevant record, the Court slightly alters DRPSAMF ¶ 120 to reflect the record and admits PSAMF ¶ 120.

Ms. Kordak testified that she was generally aware that other employees referred to African employees as "Africans" and commented about issues concerning punctuality and cell phone usage.  PSAMF ¶ 121; DRPSAMF ¶ 121.[54]  Ascentria did not take any action in response to the subject comments.  PSAMF ¶ 122; DRPSAMF ¶ 122.

## III.   THE PARTIES' POSITIONS

### A.   Ascentria Care Alliance's Motion for Summary Judgment

Ascentria submits that the "undisputed facts show that Ascentria received multiple reports from various individuals verbalizing discomfort in comments made by [Ms.] Behlen in violation of Company policy stemming from disrespectful references to individuals on the basis of their races and national origins."  *Def.'s Mot.* at 1.  According to Ascentria, Ms. Behlen "now attempts to argue that she is insulated from remedial action because she advocated on behalf of clients during her employment" when in reality "[t]hroughout her employment, [Ms.] Behlen made reports of perceived safety and health violations . . . [and t]hese reports were required by her job and were unrelated to termination of her employment."  *Id.*  Ascentria maintains that Ms. Behlen's employment was instead "terminated because of repeated violations of [Ascentria]'s Equal Employment Opportunity ("EEO") Policy."  *Id.* at 2.

---

[54]     Ascentria qualifies PSAMF ¶ 121, saying "[Ms.] Kordak testified that she was aware generally, but not specifically, of employees other than [Ms.] Behlen 'referring to the Africans as Africans.'" DRPSAMF ¶ 121.  Having reviewed the relevant record, the Court slightly alters PSAMF ¶ 121 to reflect the record and admits the fact.

For the purposes of summary judgment, Ascentria "does not dispute that [Ms.] Behlen engaged in protected activity as defined by the MWPA and that she experienced an adverse employment action, satisfying the first and second prongs of the prima facie test." *Id.* at 14. Ascentria submits, however, that Ms. Behlen cannot "establish a causal connection between her protected activity and termination" because her "continued derogatory comments concerning the race and national-origin of co-workers . . . was the but for cause of her termination." *Id.*

Ascentria contends that Ms. Behlen's "behavior was in clear violation of Ascentria's EEO Policy and Ethics Statement—which [Ms.] Behlen received, understood, and signed—and resulted in the decision to terminate" Ms. Behlen's employment. *Id.* at 15. Ascentria further contends that Ms. Behlen had "appropriately been advocating on behalf of clients for years, but it wasn't until her derogatory comments . . . were reported that action was taken." *Id.* Ascentria asserts that "[b]lowing the whistle does not provide protection for employees to then generally violate the employer's policies and procedures, or otherwise violate the rights of others." *Id.* at 16 (collecting cases). According to Ascentria, it "does not have to permit such violative behavior to continue simply because [Ms.] Behlen previously made complaints about patient health and safety." *Id.*

Ascentria submits that Ms. Behlen has "failed to set forth evidence that [its] legitimate, non-discriminatory basis for terminating her employment was a pretext under the [Maine-specific] *Brady* standard, and therefore summary judgment on the MWPA retaliation claim in warranted." *Id.* at 17. Here, Ascentria insists that Ms.

Behlen "still would have been terminated (for violation of Ascentria's EEO Policy) even if she had never participated in protected activity." *Id.*

Regarding causality, Ascentria contends that "[t]emporal proximity may be sufficient to establish [Ms.] Behlen's prima facie case of whistleblower retaliation . . . but is insufficient, 'by itself, to forge a causal link strong enough to create an inference of causation and thus satisfy *Brady*'s new Maine-specific retaliation paradigm in the face of an employer's asserted legitimate non-retaliatory reason for the adverse employment action.'" *Id.* at 17-18 (quoting *Theriault v. Genesis Healthcare LLC*, 890 F.3d 342, 352 (1st Cir. 2018)).

Ascentria further contends that Ms. Behlen's "denial of the accuracy of the reports of the EEO Policy violations does not overcome Ascentria's reasonable belief or create a triable issue . . . [and] Ascentria's belief that [Ms.] Behlen violated the EEO policy at the time of her termination is sufficient to support those actions." *Id.* at 19. Ascentria urges that a "non-moving part[y's] disagreement with the reason for the challenged action . . . is not in and of itself sufficient to evidence pretext." *Id.* According to Ascentria, Ms. Behlen "cannot show that Mr. Grant, Ms. Sweet, or Ms. Kordak, each of whom played key roles in the termination decision, manufactured specific instances of violation of the EEO Policy because of Plaintiff's advocacy on behalf of clients. *Id.* at 20.

## B.     Rebecca Behlen's Opposition

Rebecca Behlen contends that she is a "fierce advocate for the health and welfare of the mentally disabled individuals" who "fought . . . to provide proper care to the disabled residents" and in response, "Ascentria falsely and recklessly labeled

her a racist and terminated her" in a "clear violation of the Maine Whistleblowers Protect[ion] Act." *Pl.'s Opp'n* at 1. According to Ms. Behlen, "Ascentria's articulated basis for [Ms.] Behlen's termination simply means that a triable issue of fact exists as to the reason for [her] termination." *Id.* at 19

Ms. Behlen submits that Ascentria's motion "only challenges the final element of the prima facie case—the causal link" but "[t]he record contains evidence of both an immediate temporal link and pretext, evidence which coupled with the light evidentiary [standard], creates a triable issue of material fact as to the causal link element." *Id.* at 2. Ms. Behlen further submits that "[p]retext may be demonstrated through weaknesses, implausibilit[ies], inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a fact finder could infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 16. Specifically, Ms. Behlen asserts that the following preclude summary judgment:

- "The basis for [Ms.] Behlen's termination is false" because she "emphatically denies the allegation by [Mr.] Grant [and her] assertion is certainly consistent with the relevant facts." *Id.*

- "The reason for the termination is inconsistent" because "[Ms.] Katembe, one of the decisionmakers . . . also praised [Ms.] Behlen's work performance, claiming she had no issues with [her] performance." *Id.* at 17.

- "The basis for [Ms.] Behlen's termination is weak" because "Ascentria continually casts [Ms.] Behlen as racist based upon her alleged comments." *Id.*

- "Defendant deviation from policy" because Ms. Dexter "testified at length regarding Ascentria's policy to thoroughly investigate and document allegations of racism" but the record "contains much evidence from which a trier of fact could reasonably infer that [Ms.] Dexter diverted from policy, and did not meaningfully investigate [Mr.] Grant's allegation." *Id.* at 17-18.

- "Evidence of animus" because "[t]he record contains much evidence of management exhibiting animus towards [Ms.] Behlen because of advocacy for the disabled residents." *Id.* at 18.

- "False statements" because "[t]he record contains evidence of false statements by management calling into question their veracity." *Id.*

- "Differential treatment" because "[t]he record contains evidence that Ascentria treated [Ms.] Behlen differently than other employees accused of making racial comments." *Id.*

Ms. Behlen concludes that "[t]he totality of the record, coupled with the low evidentiary burden at the prima facie stage, would allow a trier of fact to reasonably find the causal link satisfied." *Id.*

### C.     Ascentria Care Alliance's Reply

Ascentria asserts that although Ms. Behlen "attempts to create an issue of fact by denying the legitimacy of certain information that was provided to decision-makers, her denial is insufficient to evidence animus or inconsistency to evidence pretext or disprove that Defendant was within its rights in enforcing its EEO Policy." *Def.'s Reply* at 1.

Ascentria insists it is "undisputed that [Ms.] Behlen on multiple occasions made derogatory generalizations about individuals based on their national original." *Id.* "In attempting to create an issue for a factfinder she relies upon conjecture to signal inconsistencies, weaknesses, and contradictions related to Defendant's termination decision; such allegations, however, are not supported by the record and are insufficient to result in the Court second-guessing Ascentria's legitimate business decision to terminate Plaintiff for violating its EEO Policy." *Id.* at 2.  According to Ascentria, Ms. Behlen "is mistaken that a genuine issue of fact exists that would create a question for a factfinder." *Id.*

Ascentria submits that "[t]o the extent Plaintiff supports her temporal proximity argument with alleged retaliatory animus by [Mr.] Grant, the facts do not support that [Mr.] Grant acted based on animus or pretext" and "[t]here is no evidence that [Mr.] Grant retaliated against Plaintiff as a result of those reports; in fact, in October 2018 when he was interviewed in connection with the initial complaint of improper statements made by Mr. Sullivan, he did not substantiate the allegations made" and "[t]here is no evidence to explain why [Mr.] Grant would tell the truth in

39

October but lie in June." *Id.* at 3. Ascentria explains that although Ms. Behlen's "arguments 'may suffice to create a genuine factual dispute about whether she *actually*' made the comments at issue, 'that is beside the point: evidence of a decisionmaker's mistaken judgment is not dispositive to the question of pretext unless the evidence would permit the factfinder to conclude that the stated nondiscriminatory justification for the adverse employment action was either knowingly false or made in bad faith.'" *Id.* at 5 (citing *Murray v. Kindred Nursing Ctrs. W. LLC*, 789 F.3d 20, 27 (1st Cir. 2015).

Ascentria concludes that Ms. Behlen's "attempts to evidence Defendant's animus or pretext grounded in her denial of violation of the EEO Policy, if accepted, would result in employers requiring no less than irrefutable proof or an admission of bad behavior in order to enforce its own EEO policies" which is an "untenable position, hindering an employer's ability to protect employees from discriminatory conduct and behavior prohibited by law." *Id.* at 7.

## IV.   LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "Genuine issues of fact are those that a factfinder could resolve in favor of the nonmovant, while material facts are those whose 'existence or nonexistence has the potential to change the outcome of the suit.'" *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 38 (1st Cir. 2014) (quoting *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011)).

When the movant "has made a preliminary showing that there is no genuine issue of material fact, the nonmovant must 'produce specific facts, in suitable evidentiary form, to . . . establish the presence of a trialworthy issue.'" *McCarthy v. City of Newburyport*, 252 F. App'x 328, 332 (1st Cir. 2007) (alteration in original) (quoting *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999)). The nonmoving party must provide "'enough competent evidence' to enable a factfinder to decide in its favor on the disputed claims." *Carroll v. Xerox Corp.*, 294 F.3d 231, 237 (1st Cir. 2002) (quoting *Goldman v. First Nat'l Bank of Bos.*, 985 F.2d 1113, 1116 (1st Cir. 1993)). Then, a "court views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), but disregards "[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation." *Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "[T]he plain language of Rule 56(c) mandates entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## V.    DISCUSSION

### A.    Retaliation in Violation of the Maine Human Rights Act for Engaging in Protected Activity under the Maine Whistleblower Protection Act

Rebecca Behlen claims that Ascentria Care Alliance retaliated against her in violation of the Maine Human Rights Act by terminating her employment because

she made complaints about the quality of patient care at the Falmouth House Facility. Ascentria instead claims that it terminated Ms. Behlen's employment because she violated its Equal Employment Opportunity Policy by making inappropriate comments regarding the race and national origin of her co-workers.

### 1. Legal Standard

The Maine Whistleblower Protection Act (MWPA) provides: "No employer may discharge . . . an employee . . . because . . . [t]he employee, acting in good faith . . . reports to the employer or a public body, orally or in writing, what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual." 26 M.R.S.A. § 833(1)(B). The elements of a prima facie MWPA claim are (1) that the employee engaged in protected activity; (2) that the employer imposed adverse employment action against the employee; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, 129 A.3d 944, 948 (Me. 2015); *see also Theriault v. Genesis Healthcare LLC*, No. 2:15-CV-530-GZS, 2017 U.S. Dist. LEXIS 59598, at *7 (D. Me. Apr. 19, 2017), *aff'd*, 890 F.3d 342 (1st Cir. 2018); *Flaherty v. Unum Grp.*, No. 2:18-cv-00240-GZS, 2019 U.S. Dist. LEXIS 197284, at *23-24 (D. Me. Nov. 14, 2019).

When reviewing MWPA claims at the summary judgment stage, the Law Court has developed a "Maine-specific retaliation paradigm." *Theriault*, 890 F.3d at 351 (discussing *Brady v. Cumberland Cnty.*, 2015 ME 143, 126 A.3d 1145). Under this paradigm, the Court asks "whether the record as a whole would allow a jury to

reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent." *Brady*, 126 A.3d at 1158 (Me. 2015) (emphasis added). To answer this question, the Court must, "in a seamless inquiry, recognize any evidence that the employer had a lawful reason for the adverse action taken against the employee, and any evidence that the proffered reason is merely a pretext." *Theriault*, 890 F.3d at 350 (citation and internal quotations omitted). "The Law Court no longer applies *McDonnell Douglas* burden shifting to MWPA claims; however, the plaintiff must still 'adduce precisely the same quantum of proof . . . to defeat summary judgment.'" *Ako-Annan v. E. Me. Med. Ctr.*, No. 1:19-cv-00544-JAW, 2021 U.S. Dist. LEXIS 157866, at *92 (D. Me. Aug. 20, 2021) (quoting *Theriault*, 890 F.3d at 350).

Here, the parties dispute only the third prong: whether there was a causal connection between the protected activity and the adverse employment action. "An employee's protected activity is causally connected to the adverse employment action when the alleged retaliation was a substantial, even though perhaps not the only, factor motivating the adverse employment action." *Johnson v. York Hosp.*, 2019 ME 176, ¶ 23, 222 A.3d 624, 631) (cleaned up). "Any relevant evidence, including temporal proximity, may be considered in determining whether there is an arguable causal nexus." *Id.* The plaintiff "has the burden of producing some evidence from which a reasonable jury could find a causal link." *Brady*, 126 A.3d at 1154. "[P]retext evidence can also serve as causation evidence that bears on a plaintiff's prima facie case." *Brady*, 126 A.3d at 1151.

The Court therefore "determine[s] whether, cumulatively, [the evidence] would allow a reasonable jury to infer that" Ms. Behlen was fired "in part due to [her] protected activity." *Id.*; *see also id.* at 1158 ("Without *McDonnell Douglas*, the court will now consider that evidence in a unitary way and simply determine whether the record as a whole would allow a jury to reasonably conclude that the adverse employment action was motivated at least in part by retaliatory intent"). The Court concludes that it would. Although Ascentria proffers a legitimate reason for terminating Ms. Behlen, Ms. Behlen has supplied sufficient evidence such that a reasonable jury could infer Ascentria's proffered reason is pretextual and that she was fired in part due to her protected activity.

### 2. Analysis of the Whistleblower Claim Without Discriminatory Evidence

The Court accepts the parties' view that Ms. Behlen has proven two of the three elements of a MWPA action: she engaged in protected activity and suffered an adverse employment action, leaving only whether the record presents a triable question of fact as to whether there is a causal connection between her protected activity and her termination. The Court approached this motion by asking whether, absent her own alleged misconduct, Ms. Behlen adduced sufficient evidence to make out a claim under the MWPA.

The Court easily concludes she has. The record reflects that Ms. Behlen registered an unusual number of substantive complaints with management about Ascentria's operations from 2010 until she was terminated on July 23, 2019. In terms of frequency and chronicity, the record shows: 1) five complaints in 2010; 2) two in

2011; 3) one in 2012; 4) three in 2017; 5) nine in 2018; and 6) thirteen in 2019 before her July 23, 2019 termination.  Except for a 2010 complaint about back pay and a 2012 allegation of sexual harassment, all Ms. Behlen's complaints concerned the quality of care at Ascentria for its clients at Falmouth House.

A factfinder could find that some of Ms. Behlen's complaints raised serious, chronic, and potentially embarrassing issues for Ascentria.  These included concerns about medication management, medication storage, dietary issues for the clients, invasion of client privacy by a staff member, numerous issues of basic maintenance, inadequate client clothing, specifically a need for new underwear and socks, lack of training of new personnel, missing Certified Nurses' Aide certificates among staff, inaccurate transcription of doctors' orders, and failure to follow established protocols. Moreover, Ms. Behlen directly linked Falmouth House's alleged inadequacies to a deterioration in its clients' well-being, worrying about RM's proper receipt of medication, weight gain, and declining health in 2019.  Although some of Ms. Behlen's maintenance concerns seem routine, such as a failure to fix a cracked tile, some were major, including the furnace breaking down in March 2019.

Ms. Behlen did not mince words.  As early as April 2010, she was saying that she was surprised that DHHS (the Maine Department of Health and Human Services) had not "shut the place down."  In February 2019, she accused Falmouth House of "slowly killing RM", one of the clients, due to improper medication and diet. In March 2019, she said she would not want to live at Falmouth House due to its condition.  Again in March 2019, she described Ascentria's management of Falmouth

House as "nothing short of neglect." By April 2019, she wrote that in all her years at Falmouth House, she has never "seen it as bad as it is now." In June 2019, she reiterated her view that Falmouth House was "by far the worst it has ever been."

There is evidence in the record that Ascentria management was uncomfortable with Ms. Behlen's repetitive documentation of its asserted inadequacies. On May 11, 2019, Ms. Behlen wrote by email to Ms. Katembe with copies to Mr. Grant and Ms. Sweet, noting: "I know that you have requested no emails." This suggests that Falmouth House management was concerned about Ms. Behlen creating a digital record of its alleged failings. Furthermore, at one point, Ms. Katembe responded to Ms. Behlen by urging her sometimes to acknowledge and appreciate what the staff had accomplished. Indeed, Ms. Katembe described as "credible" Ms. Behlen's complaints about the conditions at Falmouth House, which means that if the DHHS had audited Falmouth House, had become aware of Ms. Behlen's emails, and had performed an inspection of Falmouth House, it would have corroborated her claims of operational deficiencies.

As the Court will discuss later, the temporal proximity between the complaints and Ms. Behlen's termination is some evidence that Ascentria terminated her because of the complaints. The record suggests that Ms. Behlen's complaints about Falmouth House were reaching a crescendo in the months leading up to her termination. Ms. Behlen wrote a laundry list of facility and operational deficiencies in late March 2019. In late March and again in early April 2019, she contacted Ms. Upham, Ascentria's nursing consultant, about Falmouth House's failure to comply

46

with doctors' medication orders.  In May 2019, she informed Ms. Katembe that she was emailing her in order to create "a paper trail."  By June 20, 2019, Ms. Behlen was emailing that conditions at Falmouth House were "by far the worst" she had ever experienced.  Then, on July 6-7, 2019, about two weeks before her termination, she observed a client with a black eye and a bruise around his lip, and when questioned, the client said that Mr. Grant "did it."  On July 9, 2019, less than two weeks before her termination, Ms. Behlen emailed Ms. Sweet about this incident "out of concern for SN at Falmouth."

Finally, the evidence in this record confirms that Ms. Behlen was an extremely competent DSP while working at Falmouth House.  Ms. Katembe confirmed that she was "really good with clients", that her clients trusted her, and that she was "good in her documentation and communication."  There is no evidence in this record of any issues with Ms. Behlen's job performance.  Thus, but for the issues with her racial remarks, the only basis for her termination would be her persistent whistleblowing complaints.  This brings the Court to whether there is a jury question as to whether Ascentria terminated Ms. Behlen because of her complaints, because of her racist remarks, or because of a combination of the two.

### 3.    The Allegations of Racism

#### a.    The Sullivan Accusation, the Investigation, and the Corrective Action Plan

A factfinder could well find that Ascentria's concerns about Ms. Behlen's racially[55] insensitive comments justified her termination. The record confirms that Ascentria maintained an EEO Policy, which prohibited discrimination and required equal opportunities for all persons regardless of race or national origin, and its employees, including Ms. Behlen, were bound not to discriminate on the basis of race or national origin, to respect the rights and views of colleagues, to treat other employees with respect to their rights and views and with fairness, courtesy, and good faith, and not to engage in any harassment. The Ascentria EEO policy expressly provided that a violation of these EEO policies could result in discipline, even termination. DSMF ¶ 14-15; PRDSMF ¶ 14-15

Liam Sullivan's September 18, 2018 email alleged that Ms. Behlen violated the EEO policy in several ways: (1) verbal bullying of staff, (2) expressing distaste for "all Africans," (3) commenting on the Africans' work ethic and religious choices, (4) stating she wished they would go back to Africa, (5) asking AJ Grant to hire more white people or black people from the United States, and (6) stating that she was not like this before, but "they made me this way." During her investigation of Mr. Sullivan's accusations, Ms. Dexter discovered in conversations with Mr. Grant, Ms. Kordak, and Ms. Sweet that Ms. Behlen had grouped together and referred to the employees from Africa as the Africans, had discouraged Mr. Grant from hiring employees from a competitor because "they are mostly Africans," referred to Falmouth House as becoming Congoville as a result of the number of Africans

---

[55]    It makes no difference for its analysis, but the Court uses the term, racial, even though in the context of this case, a more accurate term might well be discrimination based on national origin.

working there, and described the Africans as coming to work in flip-flops and refusing to shovel snow.

After Ms. Dexter investigated these complaints, she found that she could not draw a conclusion about whether Ms. Behlen had commented on the Africans' religious choice or whether she had said that the Africans should return to Africa, but Ms. Dexter did conclude that Ms. Behlen used the term, "the Africans", to refer to individuals as a group.  The October 6, 2018 Corrective Action Plan focused on the allegation that Ms. Behlen "lump[ed] an entire group of people together based on the behavior of 1 or 2 people." *Corrective Action Form* at 1.  The Corrective Action Plan informed Ms. Behlen that if she had concerns about other employees being tardy or having performance issues, she should bring those concerns to her Team Leader.  It warned Ms. Behlen that in the future, if she made inappropriate references to the African staff or if there were additional incidents relating to this topic, she could be subject to further discipline, including termination.

### b.  Rebecca Behlen's Response

Although Ms. Behlen did not recall using the term, Congoville, she agreed that it was offensive and would have apologized if it had been brought to her attention.  Otherwise, Ms. Behlen did not accept the Corrective Action Plan and refused to sign it.  She objected to the fact that her accuser was never identified, and she later emailed a rebuttal to the Corrective Action Plan, arguing that she was not racist, that she had done mission work in Africa and India and that she had lived with an African American man for eleven years before he passed away.  She thought that Ascentria

should do more training, but that it should emphasize that the Africans must adapt to American culture, and she should not be expected to adapt to theirs.  She viewed her concerns about the Africans solely as issues about their "unethical work performance."

### c.        The Allegations Leading to Termination

On June 24, 2019, Mr. Grant emailed Ms. Katembe with new accusations against Ms. Behlen, asserting that she had vocalized her displeasure with certain staff, run through a list of complaints, and asked if Ascentria could hire more white people because bringing in more Africans would mean that the quality of work would go down.  Mr. Grant alleged that Ms. Behlen said that she could not say these things to Ms. Katembe or Ms. Sweet because she would get in trouble, but she felt she could say them to him.  After Ms. Dexter undertook a second investigation, she told Ms. Katembe that she could make the decision whether Ascentria should issue a final written warning or terminate her.  Ms. Katembe consulted with Ms. Sweet and decided to terminate Ms. Behlen, and Ascentria formerly terminated her on July 23, 2019.

### d.        Analysis of Ascentria's Termination Rationale

Based on the record, a factfinder could well conclude that the reason Ascentria terminated Ms. Behlen was that she had violated its EEO policy.  The gravamen of Ascentria's investigation and discipline of Ms. Behlen was that she treated and continued to treat all employees from Africa as an undifferentiated group, not as individuals, and the Corrective Action Plan directed her to cease thinking of the

50

employees from Africa as a single entity and to view them as individuals. She failed to do so, when she criticized the Africans to Mr. Grant and expressed the view that Ascentria should hire white people. This led to her dismissal, and a jury could readily conclude, based on these facts, that Ascentria was justified in its termination decision.

### 4.      Other Factors

Having concluded that the record could justify a factfinder to determine that Ms. Behlen could prove her MWPA claim, but for evidence of her discriminatory behavior, and that the record could also justify a factfinder to determine that the reason Ascentria terminated Ms. Behlen was her repeated violations of its EEO policy, the Court turns to whether the record so compels the conclusion that Ascentria terminated Ms. Behlen for her discriminatory conduct and not for her whistleblowing. Viewing disputed evidence in the light most favorable to Ms. Behlen, the Court concludes that a reasonable jury could find that Ascentria terminated Ms. Behlen at least in part due to her whistleblowing conduct.

### 5.      Temporal Proximity

The First Circuit has written that "[o]ne way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action." *Wyatt v. City of Boston*, 35 F.3d 13, 16 (1st Cir. 1994). Here, Ms. Behlen's most recent protected activity took place from February 2019 to July 9, 2019, thereby making the protected activity "close in time" to Ascentria's adverse action. Maine law allows for "[t]emporal proximity of an

employer's awareness of protected activity and the alleged retaliatory action" to "serve as the causal link for purposes of a prima facie case." *Cormier v. Genesis Healthcare LLC*, 2015 ME 161, ¶ 22, 129 A.3d 944 (quoting *Daniels v. Narraguagus Bay Health Care Facility*, 2012 ME 80, ¶ 21, 45 A.3d 722).

At the same time, "[t]emporal proximity alone cannot create a trialworthy issue on causation when an employer proffers legitimate, non-retaliatory reasons for its termination decision." *Lennan v. Healthcare Servs. Grp.*, No. 2:20-cv-00057-GZS, 2022 U.S. Dist. LEXIS 29612, at *25 (D. Me. Feb. 17, 2022); *see Theriault*, 890 F.3d at 352 ("temporal proximity . . . is not sufficient, by itself, to forge a causal link strong enough to create an inference of causation and thus satisfy *Brady's* new, Maine-specific retaliation paradigm in the face of an employer's asserted legitimate non-retaliatory reason for the adverse employment action"); *see also Vera v. McHugh*, 622 F.3d 17, 34 (1st Cir. 2010) ("[t]iming may bear on the question of causation in a retaliation claim, but . . . a 'narrow focus [on timing may] ignore [ ] the larger sequence of events and also the larger truth'") (alterations in *Vera*) (quoting *Freadman v. Metro. Prop. & Cas. Ins. Co.*, 484 F.3d 91, 100-01 (1st Cir. 2007))).

Here, the temporal proximity of Ms. Behlen's protected activity coincides with the temporal proximity of Mr. Grant's new accusations of June 24, 2019 and the ensuing investigation.  Thus, the force of the temporal proximity of Ms. Behlen's protected activity is muted to some degree by the corresponding temporal proximity of her EEO violations.

Moreover, as the Law Court has written, even though temporal proximity is not dispositive, "[a]ny relevant evidence, including temporal proximity, may be considered in determining whether there is an arguable causal nexus." *Johnson v. York Hosp.*, 2019 ME 176, ¶ 23, 222 A.3d 624. The Court turns to the "larger sequence of events," *Vera*, 622 F.3d at 34, to determine whether there is other "relevant evidence" that resolves the pending motion.

### a.   Legitimate Non-Discriminatory Reason and Pretext

"If the employer puts forth evidence of a legitimate non-retaliatory reason, the employee must adduce some evidence that the employer's proffered reason is pretextual." *Theriault*, 890 F.3d at 352. A plaintiff may show pretext by establishing "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" for the challenged employment action. *Cookson v. Brewer Sch. Dept.*, 974 A.2d 276, 282 (Me. 2009) (quoting *Billings v. Town of Grafton*, 515 F.3d 39, 55-56 (1st Cir. 2008)); *see Murray*, 789 F.3d at 27 (pretext can be established upon a showing of "either knowing falsity or bad faith"). "'[B]y engaging in a protected activity an employee does not acquire immunity from the same risks that confront virtually every employee every day in every work place.'" *Murray*, 789 F.3d at 28 (quoting *Blackie v. Maine*, 75 F.3d 716, 723-24 (1st Cir. 1996)). "As the Law Court has cautioned, 'when judges evaluate a summary judgment record, they should be mindful that what might initially appear to be a weak case of pretext is not the same as no case. Proof produced by the employee should be evaluated with an awareness that reasonable jurors can and often do

disagree as to both the weight and meaning of evidence.'" *Lennan*, 2022 U.S. Dist. LEXIS 29612, at *28 (quoting *Trott v. H.D. Goodall Hosp.*, 66 A.3d 7, 14-15 (Me. 2013)).

Here, Ms. Behlen provides seven bases on which she claims "a trier of fact [could] infer pretext or falsity." *Pl.'s Opp'n* at 16. The Court addresses each in turn.

First, Ms. Behlen argues that "[t]he basis for [her] termination is false" because she "emphatically denies the allegation by [Mr.] Grant," testifying that she "did not make any such comments because she knew it would expose her to termination given the earlier Corrective Action." *Id.* Ms. Behlen submits that "[a] trier of fact . . . could . . . believe [Ms.] Behlen and disbelieve [Mr.] Grant," making it such that "[a] triable issue of fact . . . exist[s] as to whether the reason for [her] termination is false." *Id.* at 17.

Ms. Behlen's contention that she did not make the remarks reported by Mr. Grant regarding the hiring of Black employees at Ascentria, however, does not necessarily mean that her MWPA claim has generated a genuine issue of material fact. In fact, the question is only whether Ascentria had a legitimate legal rationale for terminating Ms. Behlen—not whether the facts Ascentria believed to be true and upon which it based the decision to terminate Ms. Behlen were in fact true. *See Johnson*, 222 A.3d 624, ¶ 25 ("In his summary judgment filings, [the plaintiff] disputed the truthfulness of the accounts of his own behavior provided to the hospital's investigator. That dispute, however, does not transform the hospital's rationale for its decision to terminate [the plaintiff]'s employment into one that was

illegal"); *see Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 31 (1st Cir. 2007) ("[T]he plaintiff must show that the decisionmaker did not believe in the accuracy of the reason given"). Although the evidence "may suffice to create a genuine factual dispute about whether she *actually*" made the allegedly racist remarks upon which Ascentria claims it based the decision to terminate her employment, "that is beside the point: evidence of a decisionmaker's mistaken judgment is not dispositive of the question of pretext unless that evidence would permit the factfinder to conclude that the stated nondiscriminatory justification for the adverse employment action was either knowingly false or made in bad faith." *Murray*, 789 F.3d at 27; *see Lahens v. AT&T Mobility Puerto Rico, Inc.*, 28 F.4th 325, 336 (1st Cir. 2022) ("While [the plaintiff] may perceive the result as 'unfair,' it is well established that we 'may not sit as super personnel departments, assessing the merits--or even the rationality--of employers' nondiscriminatory business decisions'") (quoting *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 825 (1st Cir. 1991)).

The record here reveals significant unexplained aspects of Ascentria's responses that could lead a jury to conclude that Ms. Behlen's alleged misbehavior did not justify her termination or alternatively could lead a jury to credit Ms. Behlen's denials. The first issue is the missing files. Lori Dexter, Ascentria's Director of Human Resources, conducted the investigations and testified that she not only made handwritten notes of her interviews, *see* PSAMF ¶ 41; DRPSAMF ¶ 41 ("I would have documented it"), but also, she thought she created a separate folder within Ascentria's computer system to document her investigations. Yet Ascentria has not

been able to produce any contemporaneous evidence of HR Director Dexter's investigations, either in the fall of 2018 or the summer of 2019.  The absence of any records of HR Director Dexter's investigations is curious in view of her immediate reaction to Mr. Sullivan's September 2018 accusations, noting that such conduct could lead to termination and stating that she would come to Maine to handle the matter.  *See* PSAMF ¶ 37; DRPSAMF ¶ 37 ("I was called in because I was in charge of Maine employee relations at that point").  Then, when Mr. Grant made his June 2019 accusations, HR Director Dexter again handled the investigation and said that she documented her discussions.  But again, Ascentria was able to produce no contemporaneous notes, even though the Dexter investigation resulted in Ms. Behlen's dismissal.

A second area of concern is the contradiction between what HR Director Dexter said she did to investigate and what others recalled.  Regarding the Sullivan accusations, HR Director Dexter said that she spoke to Mr. Sullivan, but Mr. Sullivan did not recall it.  Similarly, regarding the Grant allegations, HR Director Dexter said that she interviewed several employees, including Mr. Grant and Ms. Behlen.  But Mr. Grant and Ms. Behlen do not recall being interviewed by HR Director Dexter after Mr. Grant made his allegations.  Furthermore, HR Director Dexter said that Mr. Grant's girlfriend had heard Ms. Behlen's racist comments, but HR Director Dexter never interviewed the girlfriend or even obtained her name.

A third concern is potential bias against Ms. Behlen from her accusers.  The record confirms that Mr. Sullivan had an obvious bias against her.  Mr. Sullivan's

wife was involved in litigation with Ms. Behlen, and the day before Mr. Sullivan made his accusations, his wife and Ms. Behlen had been at an unsuccessful mediation.

A fourth area of concern is that HR Director Dexter was unable to substantiate several of Mr. Sullivan's accusations. The most troubling of Mr. Sullivan's accusations was that Ms. Behlen had asked Mr. Grant if he could hire some white people. When questioned, however, Mr. Grant did not recall Ms. Behlen making this discriminatory comment to him. Indeed, HR Director Dexter was unable to confirm other aspects of Mr. Sullivan's accusations, including his claim that Ms. Behlen had made inappropriate comments about the African employees' religious choices and that she had said she wished they would all return to Africa.

A fifth area of concern is the potential interrelationship between Ms. Behlen's vocal criticisms of Ascentria's operations and the job duties of her superiors. Ms. Behlen's repeated written criticisms of Ascentria ran directly against the competence of Falmouth House management, including Ms. Katembe, the Program Manager for Falmouth House, and Mr. Grant, the Team Leader. Ms. Katembe was one of two Program Managers at Falmouth House and the Team Leaders reported to the Program Managers. Although the record does not contain a job description of her duties, a factfinder could infer, based on the record, that Ms. Belden was effectively criticizing Ms. Katembe's job performance. The record does contain a synopsis of MR. Grant's job duties. They included "making staff schedules at Falmouth House, updating medication information and appointments for Falmouth House residents, and performing other administrative-type duties." DSMF ¶ 6; PRDSMF ¶ 6. A

factfinder could conclude that Ms. Behlen's criticism of Falmouth House operations forcefully struck against Ms. Katembe and Mr. Grant's areas of responsibility.[56]

A sixth related area of concern is the allegation that Mr. Grant assaulted a client. On June 24, 2019, Mr. Grant wrote the email that led to Ms. Behlen's termination on July 23, 2019. On July 6-7, 2019, Ms. Behlen observed a client with a black eye and bruised lip, and the client told Ms. Behlen that Mr. Grant had done this to him. On July 8, 2019, Ms. Katembe decided that Ms. Behlen should be terminated and emailed Ms. Dexter to this effect with a copy to Mr. Grant. On July 9, 2019, Ms. Behlen wrote Ms. Sweet complaining about the incident with this client, and on July 18, 2019, Mr. Grant, who indicated he was aware that Ascentria was going to terminate Ms. Behlen, wrote Ms. Sweet with additional accusations against Ms. Behlen. A factfinder could find that to the extent Ascentria was able to reconsider its termination decision between July 8 and July 23, Mr. Grant's July 18, 2019 letter would have discouraged them from doing so. The record is unclear as to whether when Mr. Grant authored his July 18, 2019 email, he was aware that Ms. Behlen had raised concerns with Ms. Sweet about his alleged assault of a client.

A seventh area of concern is that HR Director Dexter allowed Ms. Katembe to make the final decision about whether to terminate Ms. Behlen. *See* PSAMF ¶ 98; DRPSAMF ¶ 98 ("Ms. Dexter deferred to Ms. Katembe as to whether she wanted to issue Ms. Behlen a final written warning or proceed with termination"). As Program

---

[56]     There is evidence in this record that on July 9, 2019, between June 24, 2019, when Mr. Grant emailed the concerns that led to Ms. Behlen's termination, and July 23, 2019, when Ascentria terminated her, Ms. Behlen emailed Ms. Sweet complaining about Mr. Grant and alleging that he had assaulted a client.

Manager of Falmouth House, Ms. Katembe would have been one of the prime targets of Ms. Behlen's persistent complaints about the inadequacy of Falmouth House operations. The parties have not presented the Court with Ascentria's personnel policies, so the Court does not know the decision-making tree contemplated by the policy, leading to termination of an employee. Nevertheless, based on this sparse record, a factfinder could conclude that Ms. Dexter's deferral to Ms. Katembe for the ultimate termination decision is evidence of Ascentria's bias against her. Put differently, as Ms. Katembe's and Mr. Grant's areas of job duties were the subject of Ms. Behlen's forceful criticism, it is a small step to find that both Mr. Grant, who was the second complainant, and Ms. Katembe, who was given the ultimate authority to retain or terminate Ms. Behlen, would have preferred not to be subject to Ms. Behlen's constant criticism. Alternatively, a factfinder could find that Ms. Dexter's deferral demonstrates that Ascentria was either unaware of Ms. Behlen's complaints or conclude her complaints were not considered in the termination process.

An eighth area of concern is that there is a direct coincidence between Ms. Behlen's criticisms and her job duties. According to the record, Ms. Behlen's job description provided that she was required to "provide support and advocate[] for clients as appropriate" and "ensure [the] health and safety of [residents]." DSMF ¶ 17; PRDSMF ¶ 17. Ms. Behlen understood that her job required her to advocate for a client who is ailing or being mistreated. DSMF ¶ 18; PRDSMF ¶ 18. She was also a mandated reporter, including on matters of patient abuse. DSMF ¶ 19; PRDSMF ¶ 19. Viewed in the light most favorable to Ms. Behlen, all her criticisms of Falmouth

House operations were directed to her perceptions of the needs of the residents, and although not diplomatically phrased, her criticisms of "the Africans" were related to her advocacy for the well-being of the clients.

A ninth area of concern is that the record reflects some cultural issues with some African employees that could be considered violations of Ascentria's EEO policies against sex and gender discrimination. Mr. Grant testified that some male African employees refused to cook because they considered cooking "women's work" and Mr. Grant's comment is consistent with Ms. Behlen's description of some African males refusing to learn English phrases or respond to direction from her because she is a woman. Again, viewing the evidence in the light most favorable to Ms. Behlen, her criticisms of the "African employees", such their refusal to shovel snow and do housework, tardiness, obsessive cellphone usage, and taking clients to do their own personal errands, appear to arise out of her concern for the Falmouth House clients.

Against these concerns are several facts a jury could determine justify Ascentria's termination decision. The first is the evidence that Ms. Behlen referred to Falmouth House as Congoville because of the number of African employees. Although Ms. Behlen did not recall using the term, she agreed that if she had done so, it would have been offensive, and she agreed to be more careful with her language in the future. There is no suggestion that she repeated that offensive term after October 6, 2018, when Ascentria completed the Corrective Action Form against her. Nevertheless, Ascentria could properly consider her likely use of the term, Congoville, in determining whether her conduct as an employee taken as a whole merited

termination.  The gravamen of Ascentria's adverse action against Ms. Behlen appears to have been her stubborn refusal to treat as individuals her fellow employees who were originally from Africa.  Mr. Sullivan's September 2018 complaint alleged that Ms. Behlen had voiced distaste for "all Africans", that she questioned their work ethic as a group, that she wished they would return to Africa, and that she urged Mr. Grant to hire some white people or at least a Black person from the United States.  Ascentria was not able to confirm all these accusations, but Mr. Grant did acknowledge that Ms. Behlen had referred to staff members as "the Africans" and had asked him not to hire anyone from a competitor because they are mostly Africans.  After completing her investigation, Ms. Dexter concluded that Ms. Behlen was lumping all the African employees into one category instead of treating them as individuals.  The October 6, 2018 Corrective Action Form emphasized that Ms. Behlen should not lump an entire group together based on the behavior of one or two individuals.

Ms. Behlen's responses to the investigation and Corrective Action Form suggest that she persisted in her belief that all the African employees were violating Ascentria's work policies the same way.  She agreed with the need for diversity training but thought the training should instruct the African employees about American work expectations.  After a period of quiescence, in June 2019, Ms. Behlen returned to her stereotyping behavior, complaining about the African employees and asking Mr. Grant to hire white people because the quality of work suffered if Ascentria hired more Africans.  Ascentria could have properly viewed Ms. Behlen's responses as reflecting race- or national origin-based views in violation of its EEO

policy and that her reiteration of these retrograde views compelled it to take decisive action.

Yet, even Ms. Katembe, who decided to terminate Ms. Behlen, characterized her as "really good with clients" and having developed a trust relationship with Falmouth House's clients from her long experience working with them. Ms. Behlen expressed the desirability of diversity training, and there is no indication that Ascentria offered its employees including Ms. Behlen diversity training. A jury could conclude that Ascentria's decision to forego diversity training and instead terminate an otherwise valued employee fell within its rights as her employer. However, with the backdrop of her persistent criticism of Ascentria, a jury could also infer that Ascentria's decision not to offer diversity training but instead to fire Ms. Behlen was motivated by her persistent whistleblowing.

### B.    Summary

This is a close case. The record supports both Ms. Behlen's whistleblowing claim and Ascentria's disciplinary decision. Perhaps a jury will conclude that Ascentria's termination of Ms. Behlen was unrelated to her persistent criticism of its operation, but it is also possible that a jury will conclude that Ascentria's termination decision was influenced by Ms. Behlen's constant whistleblowing. The net effect of the Court's analysis of the record is that Ms. Behlen has raised genuine issues of material fact that preclude the granting of summary judgment in Ascentria's favor.

## VI.   CONCLUSION

The Court DENIES Ascentria Care's Motion for Summary Judgment (ECF No.

24).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of May, 2023

63